# COMPOSITE EXHIBIT "A"

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR
MIAMI-DADE COUNTY, FLORIDA

CASE NO: 08 - 1 1 2 1 3 CA 20



EDIE LAQUER, an individual, LADIES
AND GENTLEMEN, LLC, a Florida
limited liability company, and LAQUER
CORPORATE REALTY GROUP, INC.,
a Florida corporation,

       Plaintiffs,

-vs-

ARTHUR FALCONE, an individual, MARC
ROBERTS, an individual, 150 NE 7TH LLC, a
Florida limited liability company, 701 NE 1ST
LLC, a Florida limited liability company, 701 NE
1ST 44 LLC, a Florida limited liability company,
701 N MIAMI LLC, a Florida  limited liability
company, 701 N MIAMI 44 LLC, a Florida limited
liability company, 701 N MIAMI 44B LLC, a Florida
limited liability company, 13 PARCELS  LLC, a Florida
limited liability company, 13 PARCELS 44 LLC, a Florida
limited liability company, 13 PARCELS 44B LLC, a Florida
limited liability company, 44 NW 11TH LLC, a Florida
limited liability company, 44 NW 11TH 44 LLC, a Florida
limited liability company, 44 NW 11TH 44B LLC, a Florida
limited liability company, 46 NE 10TH LLC, a Florida limited
liability company, 46 NE 10TH 44 LLC, a Florida limited
liability company, 46 NE 10TH 44B LLC, a Florida limited
liability company, 700 NE 1ST  LLC, a Florida limited liability
company, 700 NE 1ST 44 LLC, a Florida limited  liability
company, 700 NE 1ST 44B LLC, a Florida limited liability
company, MIAMI AUCTION PROP LLC, a Florida limited
liability company, MIAMI AUCTION PROP 44 LLC, a Florida
limited liability company, MIAMI AUCTION PROP 44B LLC,
a Florida limited liability company, MR 44 MGR LLC, a Florida
limited liability company, COMMANDER GROUP LLC, a
Florida limited liability company, MIAMI INGRAHAM
PROPERTIES 44 LLC, a Florida limited  liability company,
PARK WEST 44 LLC, a Florida limited liability company,
and HARCONE 44 LLC, a Florida limited liability company,

       Defendants.

_____/

## COMPLAINT FOR DECLARATORY RELIEF AND DAMAGES

Plaintiffs, EDIE LAQUER ("Laquer"), LADIES AND GENTLEMEN, LLC ("L&G") and LAQUER CORPORATE REALTY GROUP, INC. ("LCRG"), sue Defendants, ARTHUR FALCONE ("Falcone"), MARC ROBERTS ("Roberts"), 150 NE 7TH LLC, 701 NE 1ST LLC, 701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13 PARCELS LLC, 13 PARCELS 44 LLC, 13 PARCELS 44B LLC, 44 NW 11TH LLC, 44 NW 11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH 44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, MIAMI AUCTION PROP LLC, MIAMI AUCTION PROP 44 LLC, MIAMI AUCTION PROP 44B LLC, MR 44 MGR LLC ("MR 44"), COMMANDER GROUP LLC ("Commander"), MIAMI INGRAHAM PROPERTIES 44 LLC ("MIP 44"), PARK WEST 44 LLC ("PW 44") and HARCONE 44 LLC ("Harcone"), and allege as follows:

## NATURE OF THE ACTION

1.     This is an action for declaratory relief pursuant to Chapter 86, Florida Statutes, arising out of agreements between the parties relating to Laquer's and L&G's ownership interests in various entities and their assets, as well as an action for declaratory relief relating to LCRG's right to receive real estate brokerage commissions from certain of the Defendants, and an action for damages in excess of $15,000.00 exclusive of interest, costs and attorneys fees, arising out of certain of the Defendants' breach of contract, and is within the subject matter jurisdiction of this Court.

## THE PARTIES, PERSONAL JURISDICTION AND VENUE

2.     Plaintiff Laquer is an individual residing in Miami-Dade County, Florida, is, and at all times relevant hereto was, a real estate broker duly licensed in accordance with the laws of the State of Florida, is over 18 years of age and is otherwise *sui juris*.

2

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

3.      Plaintiff L&G is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Miami-Dade County, Florida. Plaintiff Laquer is the Manager/Member of L&G.

4.      Plaintiff LCRG is a corporation organized and existing under the laws of the State of Florida, is, and at all times relevant hereto was, a real estate broker duly licensed in accordance with the laws of the State of Florida, and maintains its principal place of business in Miami-Dade County, Florida.  Plaintiff Laquer is the majority shareholder of LCRG.

5.      Defendant Falcone is an individual residing in Palm Beach County, Florida, is over 18 years of age, is otherwise *sui juris*, and is subject to the personal jurisdiction of this Court.

6.      Defendant Roberts is an individual residing in Palm Beach County, Florida, is over 18 years of age, is otherwise *sui juris*, and is subject to the personal jurisdiction of this Court.

7.      Defendant 150 NE 7TH LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant MR 44 is the Manager of 150 NE 7TH LLC.

8.      Defendant 701 NE 1ST LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant MR 44 is the Manager of 701 NE 1ST LLC.

9.      Defendant 701 NE 1ST 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

County, Florida and is subject to the personal jurisdiction of this Court.

10.     Defendant 701 N Miami LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR44 is the Manager of 701 N Miami LLC.

11.     Defendant 701 N Miami 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendants Roberts and Falcone are the Managers of 701 N Miami 44 LLC.

12.     Defendant 701 N Miami 44B LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant Roberts is the Manager of 701 N Miami 44B LLC.

13.     Defendant 13 Parcels LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 13 Parcels LLC.

14.     Defendant 13 Parcels 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 13 Parcels 44 LLC.

15.     Defendant 13 Parcels 44B LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

County, Florida and is subject to the personal jurisdiction of this Court. Defendant Roberts is the Manager of Defendant 13 Parcels 44B LLC.

16.    Defendant 44 NW 11TH LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 44 NW 11TH LLC.

17.    Defendant 44 NW 11TH 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 44 NW 11TH 44 LLC.

18.    Defendant 44 NW 11TH 44B LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant Commander is the Manager of 44 NW 11TH 44B LLC.

19.    Defendant 46 NE 10TH LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 46 NE 10TH LCC.

20.    Defendant 46 NE 10TH 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 46 NE 10TH 44 LLC.

21.    Defendant 46 NE 10TH 44B LLC is a limited liability company organized and

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant Commander is the Manager of 46 NE 10TH 44B LLC.

22.     Defendant 700 NE 1ST LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 700 NE 1ST LLC.

23.     Defendant 700 NE 1ST 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MR 44 is the Manager of 700 NE 1ST 44 LLC.

24.     Defendant 700 NE 1ST 44B LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant Commander is the Manager of 700 NE 1ST 44B LLC.

25.     Defendant Miami Auction Prop LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court. Defendant MIP 44 is the Manager of Miami Auction Prop LLC.

26.     Defendant Miami Auction Prop 44 LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.    Defendants Roberts and Falcone are the Managers of Miami Auction Prop 44.

6

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

27.    Defendant Miami Auction Prop 44B LLC is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant Commander is the Manager of Miami Auction Prop 44B.

28.    Defendant MR 44 is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant Roberts is the Manager of MR 44.

29.    Defendant Commander is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant Roberts is the Manager of Commander.

30.    Defendant MIP 44 is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant MR 44 is the Manager of MIP 44.

31.    Defendant PW 44 is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant Roberts is the manager of PW 44.

32.    Defendant Harcone is a limited liability company organized and existing under the laws of the State of Florida with its principal place of business in Palm Beach County, Florida and is subject to the personal jurisdiction of this Court.  Defendant MR 44 is the Manager

7

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

of Harcone.

33.    Venue is proper in Miami-Dade County, Florida because the causes of action alleged herein accrued in this judicial district.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

34.    Since at least September, 2004, Defendants Falcone and Roberts, individually and through their formation of Defendants 150 NE 7TH LLC, 701 NE 1ST LLC, 701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13 Parcels LLC, 13 Parcels 44 LLC, 13 Parcels 44B LLC, 44 NW 11TH LLC, 44 NW 11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH 44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, Miami Auction Prop LLC, Miami Auction Prop 44 LLC, Miami Auction Prop 44B LLC, MR 44 MGR LLC, Commander, MIP 44, PW 44 and Harcone (collectively, the "LLC Defendants") have been assembling approximately 25 acres of property in the area of Miami, generally lying north of NW/NE 5th Street, south of NW/NE 12th Street, west of Biscayne Boulevard and east of NW 1st Avenue, with some portions of the assemblage lying somewhat beyond these general boundaries (the area in which the assemblage is occurring is referred to herein as "Park West") and are in the process of creating a "city within a city."

35.    Plaintiffs have been instrumental in helping Defendants acquire properties in Park West (collectively, the "Park West Properties") to orchestrate the assemblage.

36.    As a result of Plaintiffs' role in connection with the assemblage of the Park West Properties, prior to February 2006 Falcone and Roberts, individually and on behalf of the LLC Defendants, agreed they would provide Laquer and L&G with the right to acquire a ten percent (10%) ownership interest in each of the investment entities Defendants had acquired and were

8

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

continuing to acquire--whether through Plaintiffs or otherwise--which currently own and/or control at least seventeen (17) properties in Park West.

37.     Also as a consequence of Plaintiffs' role in assembling the Park West Properties, Falcone and Roberts, individually and on behalf of the LLC Defendants, agreed to provide Laquer and L&G with the right to acquire a five percent (5%) interest in other entities they had formed, or were forming, to develop the properties they had acquired and/or were acquiring in Park West.

38.     After the parties agreed to the essential terms of their mutual business venture, Falcone's and/or Roberts's attorneys began drafting a "Letter Agreement" and two "form" Operating Agreements to memorialize the parties' oral agreements. Laquer, Falcone and Roberts intended that they would acquire each property in Park West through limited liability companies which would be formed for such purpose. True and correct copies of the Letter Agreement and the form "Operating Agreements" are attached hereto as Composite Exhibit "A."

39.     In fact, the parties orally agreed, and the Letter Agreement recognizes, that as of at least February, 2006, Laquer has owned a ten percent (10%) interest in six (6) investment entities (the "Existing Entities") which own six (6) parcels in Park West. These entities are Defendants 13 Parcels LLC, 44 NW 11TH LLC, 46 NE 10TH LLC, 700 NE 1ST LLC, 701 N Miami LLC and Miami Auction Prop LLC (collectively, the "Original LLCs").

40.     Consistent with the parties' agreement, Falcone and Roberts formed Defendants 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13 Parcels 44 LLC, 13 Parcels 44B LLC, 44 NW 11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH 44 LLC, 46 NE 10TH 44B LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, Miami Auction Prop 44 LLC, Miami Auction Prop 44B LLC, MR 44 MGR LLC, Commander, MIP 44, PW 44 and Harcone to take title to

9

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

Falcone's and Roberts's shares of the Original LLCs and/or to manage the other LLC Defendants.

41.    Falcone and Roberts also represented that they had (and may still have) certain rights, pursuant to purchase contracts, option agreements or other agreements and arrangements, which they intend (or intended) to use to effectuate the acquisition of at least ten (10) additional properties in Park West, and that they would be forming new limited liability companies to acquire certain other properties in Park West (the "Additional Properties").

42.    The parties further agreed that Laquer and/or L&G would have the right to participate in each of the entities formed for the purpose of purchasing the Additional Properties (the "Additional Entities") and that Laquer and/or L&G would have the right to acquire a ten percent (10%) ownership interest in each such entity.

43.    In accordance with the parties' agreement, the Additional Entities in which Laquer and/or L&G have already acquired a ten percent (10%) ownership interest include, but are not limited to, 150 NE 7TH LLC and 701 NE 1ST LLC (collectively, the "Additional LLCs"). Consistent with the parties' agreement, Falcone and Roberts formed Defendant 701 NE 1ST 44 LLC to take title to their share of 701 NE 1st LLC.

44.    Other Additional Entities may currently exist, or may exist in the future, with respect to which Laquer and/or L&G have not yet been provided the right to acquire their ten percent (10%) ownership interests.

45.    Falcone and Roberts agreed with Laquer and L&G that before an Additional Entity could acquire any property, Laquer and L&G would be provided with photocopies of the proposed entity documents and at least ten (10) business days to elect the percentage interest they would own and within which they could review, approve, execute and deliver the entity

10

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

documents, and that Laquer and/or L&G would have not less than thirty (30) days (including ten (10) business days of review prior to execution of any proposed entity documents) to make the initial required capital contribution to any such entity.

46.    In addition, Falcone and Roberts, individually and behalf of the LLC Defendants, agreed that if Laquer, L&G or any entity affiliated with Laquer conveys any property to an entity in which any of the Defendants own an interest (each, a "Development Entity"), Laquer must be offered the opportunity to participate in the ownership of the Development Entity.

47.    In such an event, the parties agreed that Laquer would be entitled to obtain a five percent (5% ) ownership interest in the entity formed to hold an interest in the Development Entity (the "Participating Entity").

48.    Again, the parties agreed that in each instance, before a Development Entity could acquire any property, Laquer must be provided with photocopies of the proposed documents for the Participating Entity in which she may invest, and at least ten (10) business days to elect the percentage interest she will own and within which period should could review, approve, execute and deliver the entity documents.

49.    Laquer and/or L&G have already contributed in excess of $1.5 million to Defendants for Laquer's and/or L&G's equity interests in the Original LLCs and the Additional LLCs, and remain ready, willing and able to exercise their rights with respect to the other Additional Entities and the Participating Entities.

50.    Plaintiffs have fully performed all of their obligations and have never failed to make any capital contributions requested by any of the Defendants.

51.    Plaintiffs have fully complied, and remain, ready, willing and able to further comply with any and all obligations imposed upon them by the parties' agreements, including

11

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

tendering any and all capital required of Plaintiffs by said agreements.

52.     In fact, Falcone and Roberts have repeatedly--both orally and in writing--acknowledged Plaintiffs' equity positions in the subject entities.

53.     Nevertheless, Falcone and/or Roberts have recently taken the position that Laquer and/or L&G do not have any interest in at least one of the Additional LLCs and have recently failed to communicate with Plaintiffs regarding the Original LLCs, the other Additional Entities or the Participating Entities.

54.     In addition to Laquer's and L&G's equity interests in the Existing Entities, the Additional Entities and the Participating Entities, Falcone and Roberts, individually and on behalf of the LLC Defendants, also acknowledged and agreed that LCRG is entitled to receive real estate brokerage commissions from the Defendants or their affiliates that are the Buyer(s), Lessor(s), Joint Venturer(s) or otherwise (as applicable) with respect to certain transactions procured by Laquer and/or LCRG.

55.     Consistent with this acknowledgement and agreement, Falcone and Roberts, individually and on behalf of the LLC Defendants, represented to Plaintiffs that they would cause a document to be created and appended as Schedule "D" to the Letter Agreement to further memorialize the parties' oral agreement regarding the payment of real estate commissions to LCRG.

56.     The particular transactions that Laquer and/or LCRG procured (the "Procured Transactions") include, but are not limited to, the following[1], with respect to which Defendants or entities formed by or affiliated with them (as the Buyer(s), Joint Venturer(s), Lessor(s), or

---

[1] The people and entities listed in the first column of the following matrix have been identified with abbreviations to preserve these non-parties' privacy and confidentiality. Defendants, however, were provided with an unfiled version of this Complaint that spells out the names each of these people and entities, and Defendants are otherwise well aware of the identity of each of these people and entities.

12

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

otherwise as applicable) are obligated to pay Laquer and/or LCRG real estate commissions in the

amounts indicated at the closing of each such transaction:

| SELLER/JOINT VENTURER/PROSPECTIVE TENANT | COMMISSION AMOUNT TO BE PAID AT CLOSING BY DEFENDANTS TO LCRG |
|---|---|
| J.R. | 6% of purchase price or 6% of the value of the fair market property that is the subject of the transaction. |
| A.C. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| T.A. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| D.C./T.C. | 4% of purchase price or 4% of the fair market value of the property that is the subject of the transaction. |
| P.M. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction. |
| I.LA. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| S.B. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| H. | 3.5% of purchase price or 3.5% of the fair market value of the property that is the subject of the transaction. |
| B.G.S. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| A.2. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| F.G. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| K.S. | 6% of purchase price or 6% of the fair market value of the property that is the subject of the transaction. |
| M.D. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |
| R.B.N. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |
| M. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |

13

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

| G.T. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |
|---|---|
| B.S. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |
| U.L.S. and/or U.M.S. | 2% of purchase price or 2% of the fair market value of the property that is the subject of the transaction, and if leased, then 4% of the total aggregate lease payments over the first 10 years of the lease and 2% of the total aggregate lease payments over the next 10 years of the lease. |

57.    Defendants, however, purposely delayed attaching Schedule "D" to the Letter Agreement in an effort to repudiate their agreement with Plaintiffs.

58.    To this date--and despite the fact that they have recognized, both orally and in writing, that they agreed to pay LCRG and/or Laquer commissions on the Procured Transactions--Defendants have failed and refused to complete Schedule "D" to delineate, among other transactions procured by Laquer and/or LCRG, the Procured Transactions.

59.    Moreover, Defendants have purposefully excluded Laquer and LCRG from further the negotiations with the parties to the Procured Transactions and other transactions procured by Laquer and/or LCRG in an attempt to avoid paying LCRG and/or Laquer the real estate commissions to which they are entitled for procuring the transactions.

60.    Plaintiffs have retained the law firm of Kluger, Peretz, Kaplan & Berlin, P.L. to represent them in this action and are obligated to pay said firm attorneys fees and costs in exchange for their services.

61.    All conditions precedent to the maintenance of this action have occurred, been

14

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

performed, or have otherwise been waived, excused or satisfied.

## COUNT I—DECLARATORY JUDGMENT
### (RE: LAQUER'S AND L&G'S EQUITY INTERESTS IN THE LLCs)

Plaintiffs, EDIE LAQUER and LADIES AND GENTLEMEN, LLC, sue Defendants ARTHUR FALCONE, MARC ROBERTS, 150 NE 7TH LLC, 701 NE 1ST LLC, 701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13 PARCELS LLC, 13 PARCELS 44 LLC, 13 PARCELS 44B LLC, 44 NW 11TH LLC, 44 NW 11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH 44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, MIAMI AUCTION PROP LLC, MIAMI AUCTION PROP 44 LLC, MIAMI AUCTION PROP 44B LLC, MR 44 MGR LLC, COMMANDER GROUP LLC, MIAMI INGRAHAM PROPERTIES 44 LLC, PARK WEST 44 LLC  and HARCONE 44 LLC for a Declaratory Judgment pursuant to Chapter 86, Florida Statutes, adopt and reallege the allegations contained in paragraphs 1 through 61 above, as if fully and expressly set forth herein, and further allege as follows:

62.    This is an action for a Declaratory Judgment pursuant to Chapter 86, Florida Statutes.

63.    As discussed above, Defendants agreed that Laquer and/or L&G own a 10% equity interest in the Original LLCs and had the right to acquire a 10% equity interest in the Additional Entities.

64.    Defendants also agreed that Laquer and/or L&G would have the right to acquire a 5% equity interest in all Participating Entities.

65.    Plaintiffs have fully performed all obligations imposed upon them by the parties' agreement, including but not limited to complying with all requests by Defendants for capital contributions.

15

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

66.    Defendants have repeatedly—both orally and in writing—acknowledged Plaintiffs' 10% equity interest in the Original LLCs and the Additional LLCs.

67.    Defendants, however, have recently taken the position that Plaintiffs do not have equity interests in at least one of the Additional LLCs. Although Defendants have not indicated their position vis-à-vis the Original LLCs, the other Additional Entities or the Participating Entities, their conduct as described herein requires that this Court declare Plaintiffs' rights with respect to the Original LLCs, the other Additional Entities and the Participating Entities as well.

68.    Laquer and L&G are in doubt as to their rights with respect to their agreement with Defendants, and their equity interests in the Original LLCs, the Additional LLCs, the other Additional Entities and the Participating Entities.

69.    The relief sought herein is not merely the giving of legal advice, but is sought to declare the rights of the parties under the law and contracts as described herein.

70.    There is a bona fide, actual, present and practicable need for declaration with respect to the issues alleged herein.

71.    As such, Plaintiffs request that this Court take jurisdiction over this matter and declare the rights of the parties thereto.

**WHEREFORE**, Plaintiffs, EDIE LAQUER and LADIES AND GENTLEMEN, LLC, request that this Court take jurisdiction over the parties and provide the following relief:

A.    That this Court advance this cause on its calendar pursuant to Florida Statute § 86.111;

B.    That this Court declare that Plaintiffs own a 10% equity interest in all of the Original LLCs and the Additional LLCs, and have the right to acquire a 10% equity interest in any other Additional Entities formed by, or affiliated with, any of the Defendants, in accordance

16

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

with the terms of the parties' oral agreement;

C.      That this Court declare that Plaintiffs have the right to acquire a 5% equity interest in all Participating Entities formed by, or affiliated with, any of the Defendants, in accordance with the terms of the parties' oral agreement;

D.      That this Court order Defendants to specifically perform their obligations under the parties' agreement, by taking all actions necessary to provide Laquer and L&G with the benefits of their bargain and to provide them with their appropriate equity interests in the Original LLCs and the Additional LLCs, and to provide Plaintiffs with the opportunity to acquire ownership interests in the other Additional Entities and the Participating Entities in accordance with the terms of the parties' agreement;

E.      That this Court award Plaintiffs the costs incurred in connection with this action pursuant to § 86.081, Florida Statutes; and

F.      That this Court order such other and further relief as it deems just and proper.

## COUNT II—BREACH OF ORAL CONTRACT

Plaintiffs, EDIE LAQUER, LADIES AND GENTLEMEN, LLC and LAQUER CORPORATE REALTY GROUP, INC., sue Defendants ARTHUR FALCONE, MARC ROBERTS, 150 NE 7TH LLC, 701 NE 1ST LLC, 701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13 PARCELS LLC, 13 PARCELS 44 LLC, 13 PARCELS 44B LLC, 44 NW 11TH LLC, 44 NW 11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH 44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, MIAMI AUCTION PROP LLC, MIAMI AUCTION PROP 44 LLC, MIAMI AUCTION PROP 44B LLC, MR 44 MGR LLC, COMMANDER GROUP LLC, MIAMI INGRAHAM PROPERTIES 44 LLC, PARK WEST 44 LLC and HARCONE 44 LLC

17

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

for Breach of Oral Contract, adopt and reallege the allegations contained in paragraphs 1 through 61 above, as if fully and expressly set forth herein, and further allege as follows:

72.    As discussed above, Defendants entered into an oral contract with Laquer and L&G, pursuant to which Defendants agreed that Laquer and/or L&G own a ten percent (10%) equity interest in the Original LLCs and the Additional LLCs and that Laquer and/or L&G had the right to acquire ten percent (10%) interests in the other Additional Entities.

73.    The parties' oral contract also provided that Laquer and/or L&G own a five percent (5%) equity interest in all Participating Entities.

74.    Plaintiffs have fully performed all of the obligations imposed upon them by the parties' oral agreement, including but not limited to complying with all requests by Defendants for capital contributions.

75.    Defendants have repeatedly—both orally and in writing—acknowledged Plaintiff's equity positions in the subject entities.

76.    Defendants, however, have recently taken the position that Plaintiffs are not equity owners of at least one of the Additional LLCs, and their conduct as described herein amounts to a breach of contract with respect to the Original LLCs, the other Additional Entities and the Participating Entities as well, as Defendants have repudiated their obligations under the parties' oral contract.

77.    Defendants have also failed to prepare and/or attach Schedule "D" to the Letter Agreement in compliance with their agreement with Plaintiffs.

78.    Consequently, Defendants are in present material breach of the parties' oral contract.

79.    Plaintiffs have suffered damages as a direct and proximate result of Defendants'

18

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001/M0520480 v.2; 2/29/2008 12:28 PM}

breach of the parties' oral contract.

WHEREFORE, Plaintiffs, EDIE LAQUER, LADIES AND GENTLEMEN, LLC and

LAQUER CORPORATE REALTY GROUP, INC., demand that Judgment be entered against

Defendants, ARTHUR FALCONE, MARC ROBERTS, 150 NE 7TH LLC, 701 NE 1ST LLC,

701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13

PARCELS LLC, 13 PARCELS 44 LLC, 13 PARCELS 44B LLC, 44 NW 11TH LLC, 44 NW

11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH

44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, MIAMI AUCTION

PROP LLC, MIAMI AUCTION PROP 44 LLC, MIAMI AUCTION PROP 44B LLC, MR 44

MGR LLC, COMMANDER GROUP LLC, MIAMI INGRAHAM PROPERTIES 44 LLC,

PARK WEST 44 LLC and HARCONE 44 LLC, for compensatory damages, special damages

including but not limited to lost profits, interest, costs and such other and further relief as this

Court deems just and proper.

### COUNT III—DECLARATORY JUDGMENT
### (RE: LCRG'S REAL ESTATE BROKERAGE COMMISSIONS)

Plaintiff, EDIE LAQUER and LAQUER CORPORATE REALTY GROUP, INC., sue

Defendants ARTHUR FALCONE, MARC ROBERTS, 150 NE 7TH LLC, 701 NE 1ST LLC,

701 NE 1ST 44 LLC, 701 N MIAMI LLC, 701 N MIAMI 44 LLC, 701 N MIAMI 44B LLC, 13

PARCELS LLC, 13 PARCELS 44 LLC, 13 PARCELS 44B LLC, 44 NW 11TH LLC, 44 NW

11TH 44 LLC, 44 NW 11TH 44B LLC, 46 NE 10TH LLC, 46 NE 10TH 44 LLC, 46 NE 10TH

44B LLC, 700 NE 1ST LLC, 700 NE 1ST 44 LLC, 700 NE 1ST 44B LLC, MIAMI AUCTION

PROP LLC, MIAMI AUCTION PROP 44 LLC, MIAMI AUCTION PROP 44B LLC, MR 44

MGR LLC, COMMANDER GROUP LLC, MIAMI INGRAHAM PROPERTIES 44 LLC,

PARK WEST 44 LLC and HARCONE 44 LLC for a Declaratory Judgment pursuant to Chapter

19

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

86, Florida Statutes, adopt and reallege the allegations contained in paragraphs 1 through 61 above, as if fully and expressly set forth herein, and further allege as follows:

80.     In connection with Plaintiffs' agreement with the Defendants, as memorialized in the draft Letter Agreement attached hereto as Exhibit "A," Defendants agreed that they would pay LCRG and/or Laquer real estate brokerage commissions upon the closing of the Procured Transactions and the other transactions procured by Laquer and/or LCRG.

81.     Defendants also agreed with Laquer and LCRG that they would attach a list of, among other transactions, the Procured Transactions as "Schedule D" to the Letter Agreement.

82.     Defendants have purposely refused to attach Schedule D to the Letter Agreement in an effort to oust Plaintiffs from all of the subject transactions in contravention of their express agreement with Plaintiffs.

83.     Plaintiffs procured all of the Procured Transactions (as well as other transactions to be identified in further proceedings and, if necessary, included in an amended pleading) and are entitled to be compensated accordingly.

84.     In fact, Defendants previously acknowledged--both orally and in writing--that LCRG is entitled to be paid real estate commissions at the closing of each of the Procured Transactions.

85.     Defendants, however, have since failed and refused to advise Plaintiffs of the current status of each of the Procured Transactions--including but not limited to the closing date for each such transaction--and have purposely excluded Plaintiffs from the continued negotiations between the parties to the Procured Transactions in an attempt to deprive Plaintiffs of their rightfully earned brokerage commissions.

86.     Plaintiffs have fully performed all obligations required of them as the procuring

20

cause of the Procured Transactions, but Defendants contend that Plaintiffs are not entitled to be paid commissions in the amounts described above.

87.    Plaintiffs Laquer and LCRG are in doubt as to their rights with respect to the commissions to which they are entitled in connection with the Procured Transactions, a list of which Defendants should be required to attach as Schedule "D" to the Letter Agreement as previously agreed upon by Defendants.

88.    The relief sought herein is not merely the giving of legal advice, but is sought to declare the rights of the parties under the law and contracts as described herein.

89.    There is a bona fide, actual, present and practicable need for declaration with respect to the issues alleged herein.

90.    As such, Plaintiffs request that this Court take jurisdiction over this matter and declare the rights of the parties thereto.

**WHEREFORE**, Plaintiffs, EDIE LAQUER and LAQUER CORPORATE REALTY GROUP, INC., request that this Court take jurisdiction over the parties and provide the following relief:

A.    That this Court advance this cause on its calendar pursuant to Florida Statute § 86.111;

B.    That this Court declare that Laquer and/or LCRG are entitled to be paid real estate brokerage commissions in the amounts described above;

C.    That this Court declare that Defendants are required to append the list of the Procured Transactions and the other transactions procured by Laquer and/or LCRG, and the commissions due for each such transaction as Schedule "D" to the Letter Agreement;

D.    That this Court award Plaintiffs the costs incurred in connection with this action

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

pursuant to § 86.081, Florida Statutes; and

    E.    That this Court order such other and further relief as it deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs, Edie Laquer, Ladies and Gentlemen, LLC and Laquer Corporate Realty Group,

Inc., hereby demand a trial by jury on all claims and issues set forth herein which are so triable.

**Dated:** February 29, 2008.

               **KLUGER, PERETZ, KAPLAN & BERLIN, P.L.**
               *Attorneys for Plaintiffs*
               201 South Biscayne Boulevard
               17th Floor
               Miami, Florida  33131
               Telephone: (305) 379-9000
               Facsimile:  (305) 379-3428

               By: _____
                   ALAN J. KLUGER
                   Florida Bar No. 200379
                   **TODD A. LEVINE**
                   Florida Bar No. 899119

KLUGER, PERETZ, KAPLAN & BERLIN, P.L., 201 SO. BISCAYNE BLVD., SUITE 1700, MIAMI, FL 33131  305.379.9000
2385 NW EXECUTIVE CENTER DRIVE, SUITE 300, BOCA RATON, FL 33431  561.443.0800

{Litigation\6384\0001\M0520480 v.2; 2/29/2008 12:28 PM}

Ms. Edie Laquer
c/o Laquer Corporate Realty Group, Inc.
Wachovia Tower
200 South Biscayne Boulevard
Suite 2930
Miami, Florida 33131

Re:    Park West

Dear Edie:

The purpose of this letter is to set forth the agreement ("*Agreement*") between you (directly and indirectly, "*Laquer*") and Park West 44, LLC, including all entities being utilized in Park West (as hereinafter defined) by Art Falcone and his affiliated companies, including, but not limited to, Falcone Group, LLC ("*PW 44*") with respect to certain opportunities arising in the "*Park West*" area of Miami, Florida, being the area lying north of NW/NE 5th Street and south of NW/NE 10th Street and west of Biscayne Boulevard and east of NW 1st Avenue. In general, PW 44 is pursuing the purchase of parcels in Park West, and Laquer wishes to participate in such opportunities, in accordance with the terms of this Agreement.

Laquer owns a 10% interest in 6 existing investment entities ("*Existing Entities*") which own the 6 parcels in Park West identified on attached Schedule A. PW 44 has certain rights, pursuant to purchase contracts, option agreements or other agreements and arrangements ("*Contract Rights*"), which it intends to use to effectuate the acquisition of 10 additional properties in Park West also identified on attached Schedule A ("*Identified Properties*") and may contract for the purchase of certain other, yet unidentified properties in Park West ("*Additional Properties*"). The parties acknowledge and agree that the information provided herein or in other communications, written or oral, concerning the Existing Entities, Identified Properties or Additional Properties is provided for information purposes only and not as a representation, warranty or inducement to the other party to enter into this Agreement. Without limiting the foregoing, PW 44 makes no representation or warranty, express or implied, of any kind or nature concerning the Contract Rights or the Identified Properties, or the ability of PW 44 to effectuate the acquisition of the Identified Properties, and Laquer acknowledges and agrees that PW 44 shall have the right, in its sole and absolute discretion, to proceed to acquire or abandon the acquisition of any Identified Properties and Additional Properties, and to terminate and settle any of the Contract Rights, all without any liability to Laquer.

Laquer is required to participate in the entities ("*Additional Entities*") that are formed for the purpose of purchasing the Identified Properties and Additional Properties. Laquer agrees that the interests in the Additional Entities which are offered to her shall consist of an ownership interest of at least 1% and no more than 10%, as determined by Laquer, but shall carry no voting rights or rights to participate in the day-to-day operations of the subject entity as outlined in the prior operating agreements with the Existing Entities between Laquer or an affiliate and PW 44 or an affiliate. In each instance, before an Additional Entity acquires an Identified Property or Additional Property, Laquer will be provided with photocopies of the proposed entity documents

"EXHIBIT ___A___"

Edie Laquer
Page 2

and at least 10 business days to elect the percentage interest she will own and to review, approve and execute and deliver the entity documents, and shall have not less than 30 days (including such 10 business days of review prior to execution of any proposed entity documents) to make the initial required capital contribution to any entity. The Additional Entities will be Delaware limited liability companies and the form of the entity documents for an Additional Entity will be substantially similar to those attached hereto as Schedule B.

If Laquer fails to execute and deliver the required entity documents for an Additional Entity within the time required therefor or if she commits a default (including, without limitation, failing to make a capital contribution or loan) as provided in the entity documents for an Existing Entity or an Additional Entity in which Laquer has in fact acquired an interest ("*Laquer Entities*"), she will be deemed (1) to have waived her right to participate in the ownership of the proffered Additional Entity and any future Additional Entity and Participating Entity (as hereinafter defined) and (2) to have offered to PW 44 the right to purchase all her right, title and interest in the Laquer Entities and Participating Entities in which she in fact owns an interest, with respect to which PW 44 may elect to purchase all or some of such interests. With respect to (2), PW 44 will have the right to purchase the subject interests within the 30-day period commencing on the date when PW 44 provides notice to Laquer of Laquer's failure to timely execute and deliver such entity documents or with respect to such a default, the purchase price will be the sum of the monies Laquer has contributed or loaned to the subject Laquer Entities and Participating Entities, Laquer and PW 44 will close the transfer of the interests within 30 days after PW 44 has made its election and the subject transfers will be accomplished by Laquer's execution and delivery of assignments with full warranties and free and clear of all liens and encumbrances.

Notwithstanding other provisions in this Agreement, Laquer will have no interest in or expectations of any nature, unless the subject properties are to be purchased by a Development Entity (as defined below) as permitted by this Agreement, with respect to (1) the 4 properties identified as Park West 1, Park West 3, 915 North Miami and Park West 5 and (2) any property purchased by PW 44 in Park West through a §1031 like kind exchange with respect to which PW 44 reasonably determines Laquer should not be involved (in which latter event PW 44 and Laquer will negotiate in good faith to provide Laquer with a commensurate investment opportunity in another transaction or an alternative method of investment in such transaction, provided no such alternative method may jeopardize the availability of the sought after like kind exchange and in any event the parties will not be obligated except to act in good faith).

Laquer acknowledges that the Laquer Entities will own their properties for investment and will not be involved in the active development of the subject properties. Laquer further acknowledges that PW 44 shall have the sole and exclusive power, authority and discretion on behalf of the Laquer Entities to make all decisions and conduct all business. Laquer acknowledges that prospective uses will be allocated throughout Park West and, accordingly, there could be significant variation among the values of the properties owned by the Laquer Entities based on future development use.

Edie Laquer
Page 3

If a Laquer Entity disposes of its property to an entity in which PW 44 or an affiliate holds an interest (*"Development Entity"*), Laquer will be offered the opportunity to participate in the ownership of the Development Entity. Laquer agrees that her interest in such a Development Entity will consist of an ownership interest of at least 1% and no more than 5%, as determined by Laquer, in the entity formed by PW 44 or an affiliate to hold an interest in the Development Entity (*"Participating Entity"*) but shall carry no voting rights or rights to participate in the day-to-day operations of the Participating Entity. For example, if the Participating Entity holds a 40% interest in the Development Entity and Laquer elects to own a 5% ownership interest in that entity, Laquer would own an indirect 2% interest in the Development Entity. In each instance, before a Development Entity acquires any property, Laquer will be provided with photocopies of the proposed documents for the Participating Entity in which she may invest and at least 10 business days to elect the percentage interest she will own and to review, approve and execute and deliver the entity documents. The Participating Entities will be Delaware limited liability companies and the form of the entity documents for a Participating Entity will be substantially similar to those attached hereto as <u>Schedule C</u>. Laquer acknowledges the PW 44 shall have the sole and exclusive power, authority and discretion on behalf of the Participating Entities to make all decisions and conduct all business.

In all acquisitions, whether for an Existing, Additional, Laquer or Participating Entity, Laquer shall be offered the opportunity to invest at her designated percentage utilizing the same leveraged basis as PW 44. For example, if PW 44 is able to secure 50% of the required capital for a Participating Entity but only have to issue a 40% ownership interest to the contributing party or parties, Laquer and PW 44 will benefit pro rata (between them) in such benefit.

If Laquer fails to execute and deliver the required entity documents for a Participating Entity within the time required therefor or if she commits a default (including, without limitation, failing to make a capital contribution or loan) as provided in the entity documents for a Participating Entity, she will be deemed (1) to have waived her right to participate in the ownership of the proffered Participating Entity and any future Additional Entity and Participating Entity, and (2) to have offered to PW 44 the right to purchase all her right, title and interest in the Existing Entities, Additional Entities and Participating Entities in which she in fact owns an interest, with respect to which PW 44 may elect to purchase all or some of such interests. With respect to (2), PW 44 will have the right to purchase the subject interests within the 30-day period commencing on the date when PW 44 provides notice to Laquer of Laquer's failure to execute and deliver such entity documents or with respect to such default, the purchase price will be the sum of the monies Laquer has contributed or loaned to the subject Laquer Entities and Participating Entities, Laquer and PW 44 will close the transfer of the interests within 30 days after PW 44 has made its election and the subject transfers will be accomplished by Laquer's execution and delivery of assignments with full warranties and free and clear of all liens and encumbrances.

Edie Laquer
Page 4

It is anticipated that the following terms and conditions will apply to the Participating Entities and/or Development Entities, whether or not reflected in the forms of the entity documents for Participating Entities attached hereto as <u>Schedule C</u>:   It is anticipated that PW 44 (or affiliate(s) or third party designee(s) of PW 44 or any combination thereof) will exercise all the power, authority and rights of management in each Participating Entity, either directly as the manager of the Development Entity or indirectly through its control of the PW 44 affiliate which is a member of the Development Entity.  Management will be entitled to reasonable development fees, of no less than 2% per annum of the projected committed capital (land, development and construction costs, excluding financing costs) for a Development Entity and no less than 20% of the profits. In the event the Development Entity calls for management to receive development fees greater than 2% and/or profits greater than 20%, management  may receive said amounts, but the calculation of any distributions and profits as between Laquer and PW 44 shall be limited to a 2% development fee and 20% of the profits being paid to management.

Laquer agrees that she shall not have the right to sell, transfer or in any way dispose of her interest in an Entity; provided, however, Laquer may transfer up to 50% of her non-voting/non-participating interest to Scott Silver, or an entity controlled by him.  She may, however, pledge an interest provided she has first received the consent of PW 44, which it may grant or withhold in its sole discretion.

PW 44 and Laquer shall also purchase the property known as the Miami Arena.  Laquer will cause the contract for said property to be assigned to PW 44 or its designated affiliate, and PW 44 shall reimburse Laquer, or the entity assigning the contract, at the time of assignment for 50% of the deposits paid under the contract.  At the closing, PW 44 will advance 90% and Laquer will advance 10% of the capital required to purchase the property.  PW 44 will determine before closing whether this property will be purchased for investment, in which event the purchaser would be an Additional Entity, or for development, in which event the purchaser would be a Development Entity and PW 44 and Laquer would own interests in a Participating Entity.

Laquer acknowledges and agrees that she has no express or implied broker rights with respect to any Existing Properties or Additional Properties, except as set forth on the schedule attached hereto as <u>Schedule D</u>. She further acknowledges and agrees that she will have no brokerage rights of any nature with respect to any properties owned by the Development Entities.

Laquer acknowledges and agrees that she will share with Mirmelli the commission she earns, directly or indirectly, on the Cromer Company deal.

Laquer and PW 44 acknowledge they have received good and sufficient consideration for entering into this Agreement.

Edie Laquer
Page 5

If the foregoing terms are acceptable to you, please execute the attached copy of this Agreement and return it to us.

Very truly yours,

_____

By:_____

ACKNOWLEDGED AND AGREED:

_____
Edie Laquer

H:\8289\18972\LLaquerAgreementParkWest8JW/rlc-clc-rlc-lml-clc-bap-clc-rlc

## IDENTIFIED PROPERTIES

## Schedule A

**ADDITIONAL ENTITY DOCUMENTS**

**Exhibit B**

# OPERATING AGREEMENT

## OF

## _____, LLC

### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT is made and entered into as of the _____ day of _____, 200__, (a) adopted by the Manager (as defined below) and (b) executed and agreed to by LADIES & GENTLEMEN LLC, a Florida limited liability company ("L&G") and _____ ("_____").

## ARTICLE I
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

**"Act"** shall mean the Delaware Limited Liability Company Act, as amended from time to time.

**"Adjusted Capital Account Deficit"** shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)    Credit to such Capital Account any amount which such Member is obligated to restore pursuant to Treasury Regulations §1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)    Debit to such Capital Account the items described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), (5) and (6).

**"Affiliate"** of another Person means: (a) any entity or individual that directly or indirectly controls or holds the power to vote 10% or more of the outstanding voting securities of the Person in question; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director or partner of such other Person; and (e) if such other Person is an officer, director or partner, any company for which such Person acts in any such capacity.

**"Capital Account"** as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to such date pursuant to Article VII.

**"Capital Contribution"** shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

**"Cash Flow"** shall mean the excess of cash receipts over cash disbursements, including the payment of Company debt, determined by the Manager; provided that: (i) cash receipts shall not include: (a) contributions to capital; (b) loan proceeds or other funds used to pay for the repayment of existing debt and the acquisition of capital assets or to maintain working capital; (c) insurance proceeds (other than from business interruption insurance) received on account of loss or damage to the property and proceeds received on account of any condemnation or taking of all or any part of the Company's property to the extent used or designated for use to repair, replace or restore the property; and (d) funds from Reserve accounts applied for the purpose of the Reserve but excluding those deemed surplus by the Manager; and (ii) cash disbursements shall not include: (a) distributions of Cash Flow made pursuant to Article VIII hereof; and (b) payments out of or charged against Reserve accounts; but cash disbursements shall include annual charges for Reserves.

**"Cause"** shall mean (i) committing a willful or grossly negligent act or an act of fraud which adversely affects the Company or (ii) committing a felony or other criminal act of moral turpitude.

**"Certificate of Formation"** shall mean the Certificate of Formation of the Company, filed in the office of the Secretary of State of Delaware, for the purpose of forming a limited liability company, as amended from time to time.

**"Code"** shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

**"Company"** shall refer to _____, LLC.

**"Company Covering Loan"** shall mean the loan of money to the Company by a Member pursuant to Paragraph 7.04(b)(iii), which loan will accrue interest at the rate of 20% per annum and shall be due and payable as provided in this Agreement.

**"Company Minimum Gain"** shall have the meaning set forth in Treasury Regulations §§1.704-2(b)(2) and 1.704-2(d) for "partnership minimum gain".

**"Dispose", "Disposing" or "Disposition"** shall mean a sale, assignment, transfer, gift, exchange, mortgage, pledge, granting of a security interest or other disposition or encumbrance, or the acts thereof.

**"Economic Interest"** shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members.

"**Economic Interest Owner**" shall mean the owner of an Economic Interest who is not a Member.

"**Entity**" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"**Fiscal Year**" shall mean the period terminating on December 31 of each year during the term hereof or on such earlier date in any year in which the Company shall be dissolved as provided herein.

"**Gross Asset Value**" shall mean with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)     the initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset determined with the approval of the Majority in Interest;

(ii)     the Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of the Property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations §1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above will be made only if the Company's accountants determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)     the Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value (taking Code §7701(g) into account) of such asset on the date of distribution; and

(iv)     the Gross Asset Value of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code §734(b) or Code §743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(m) and Section 10.4 hereof; provided, however, that Gross Asset Values will not be adjusted pursuant to this paragraph (iv) to the extent the Members determine that an adjustment pursuant to paragraph (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv).

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i), (ii) or (iv) above, such Gross Asset Value will thereafter be reduced by any depreciation taken into account with respect to such asset in computing Net Profits and Net Losses.

"**Initial Capital Contribution**" shall mean the initial contribution to the capital of the Company pursuant to Paragraph 7.01 of this Operating Agreement.

"**Majority Interest**" means one or more Members holding more than 50% of the Membership Units owned by the Members, other than L&G.

"**Manager**" shall mean the Person designated in Paragraph 4.02 to manage and control the business of the Company. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

"**Member**" shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become a Member. The Members and their respective Interests are set forth on attached and incorporated Exhibit A.

"**Member Covering Loan**" shall mean the loan of money to a Member pursuant to Paragraph 7.04(b)(iv), accruing interest at the rate of 20% per annum and being payable as to interest on demand but no more frequently than every three (3) months and as to principal _____ (____) months after the date the funds are advanced.

"**Member Loan**" shall mean the loan of money to the Company as described in Paragraph 7.04(a) which shall be payable as provided in this Agreement.

"**Member Nonrecourse Debt**" shall have the meaning set forth in Treasury Regulations §1.704-2(b)(4) for "partner nonrecourse debt".

"**Member Nonrecourse Debt Minimum Gain**" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations §1.704-2(i)(3).

"**Member Nonrecourse Deductions**" shall have the meaning set forth in Treasury Regulations §§1.704-2(i)(1) and 1.704-2(i)(2) for "partner nonrecourse deductions".

"**Membership Interest**" or "**Interest**" shall mean the membership interest or interest of a Member in the Company, including the right to any and all benefits to which such Member may be entitled in accordance with this Operating Agreement, and the obligations as provided in this Operating Agreement and the Act.

"**Membership Units**" shall mean one or more units owned by a Member out of the 1,000 authorized Membership Units, as designated on attached Exhibit A. Each Membership Unit represents a percentage ownership in the Company. Such percentage is computed by dividing the number of Membership Units owned by a Member by the total number of issued and outstanding

4

Membership Units. Holders of Membership Units shall be entitled to vote on all matters on which Members may vote or consent in this Agreement or under the Act.

"Net Profits" and "Net Losses" shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, as of the close of each Fiscal Year on the Company's tax return filed for federal income tax purposes.

"Nonrecourse Deductions" shall have the meaning set forth in Treasury Regulations §1.704-2(b)(1).

"Operating Agreement" shall mean this Operating Agreement as originally executed and as amended from time to time.

"Person" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

"Preferred Capital Contribution" shall mean the cash Capital Contribution provided to the Company by a Member pursuant to Paragraph 7.04(b)(ii), which shall accrue Preferred Capital Return and be payable as provided in this Agreement.

"Preferred Capital Return" shall mean 20% per annum.

"Prime Rate" shall mean the rate of interest known as the "prime rate" as published from time to time by the Wall Street Journal under the heading "Money Rates", or any similar rate published by any successor, adjusted on a daily basis, calculated on the basis of the number of days in the particular year with twelve (12) months, each of which has the number of days designated on the calendar applicable to the year in question.

"Property" means the ±_____ acre improved parcel described on attached Exhibit B.

"Purchase Price" shall mean the sum of all monies contributed or loaned by L&G to the Company.

"Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

"Sharing Ratio" shall mean the percentage that each Member's number of Membership Units bears to all outstanding Membership Units.

"Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

5

## ARTICLE II
## FORMATION OF COMPANY

**Paragraph 2.01  Formation.** The Company shall be, or has been, organized as a Delaware limited liability company by executing a Certificate of Formation, and filing same in the office of the  Delaware Secretary of State in accordance with and pursuant to the Act.

**Paragraph 2.02  Name.** The name of the Company is _____, LLC.

**Paragraph 2.03  Principal Place of Business.** The principal place of business of the Company is 1951 N.W. 19th Street, Suite 200, Boca Raton, Florida 33431. The Company may locate its places of business and registered office at any other place or places as the Manager may deem advisable.

**Paragraph 2.04  Registered Office and Registered Agent.**
The Company's initial registered office shall be at the office of its registered agent at _____, Wilmington, Delaware _____. Its initial registered agent shall be _____. The registered office and registered agent may be changed by the Members by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

**Paragraph 2.05  Term.** The Company commenced on the date of filing of the Certificate of Formation with the Delaware Secretary of State and shall continue in perpetuity or such earlier time as may be determined in accordance with the terms of this Operating Agreement.

**Paragraph 2.06  Independent Activities.** Each Member may, notwithstanding this Agreement, engage in or possess any interest in any business venture or activity of any nature or description whatsoever, independently or with others, whether the same be competitive with the Company's business or otherwise, without having or incurring any obligation to offer any interest in such other business or activity to the Company or any other Member.  As a material part of the consideration for the execution of this Agreement, each Member hereby waives, relinquishes and renounces any right or claim of participation in any business or activity of the other Members or their affiliates and the income or profits derived therefrom.  Laquer acknowledges the other Member(s) may have interests, direct or indirect, in properties adjacent or near to the Property and that the Manager, or its Affiliates, may be responsible for managing and controlling the business of other companies which own properties adjacent or near to the Property and that this Paragraph is intended to reflect her waiver and release of any claim against or interest in such other properties and operations.

6

## ARTICLE III
## BUSINESS OF COMPANY

**Paragraph 3.01  Purpose.** The business of the Company shall be to acquire the Property, to hold the Property for investment and to engage in such other lawful activities as are reasonably necessary or useful to the furtherance of the foregoing purpose.

## ARTICLE IV
## RIGHTS AND DUTIES OF MANAGER

**Paragraph 4.01  Management.** The business and affairs of the Company will be managed by one Manager, who may, but need not, be a Member. The Manager is authorized and empowered to manage and control the business of the Company. Except for situations in which the approval of the Majority in Interest is expressly required by this Operating Agreement or by nonwaivable provisions of the Act, the Manager has full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

**Paragraph 4.02  Manager.**

(a)  _____ is designated to serve as the Manager and shall continue to serve as the Manager until its resignation or removal for Cause. In the event the Manager ceases to act as Manager for any reason, the succeeding Manager shall be elected by vote of the Majority in Interest.

(b)  The Manager may appoint officers who shall serve and continue in such office for the term of the Company, unless sooner replaced by the Manager or removed by operation of law or by order or decree of any court of competent jurisdiction.

**Paragraph 4.03  Certain Powers of Manager.** Without limiting the generality of Paragraph 4.01, the Manager shall have the power and authority on behalf of the Company to:

(a)  acquire any real or personal property from any Person, whether or not such Person is directly or indirectly affiliated or connected with the Manager or any Member;

(b)  borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, mortgage, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

(c)  construct, operate, maintain and improve any real and personal property owned by the Company;

(d)      prepay, in whole or in part, refinance, amend, modify or extend any mortgages or trust deeds affecting the assets of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or trust deeds;

(e)      purchase liability and other insurance to protect the Company's property, business, employees, officers and agents, including the Manager;

(f)      hold and own Company real and personal properties in the name of the Company;

(g)      invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(h)      sell, exchange or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan at such price and upon such terms as the Manager may determine in its sole discretion;

(i)      execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trusts; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments and bills of sale; leases; and any other instruments or documents necessary or desirable to the business of the Company;

(j)      employ accountants, legal counsel, managing agents, tradesmen, contractors, subcontractors or other Persons to perform services for the Company;

(k)      enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve;

(l)      determine the use for the Property;

(m)      determine if or when to seek use entitlements for the Property; and

(n)      do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the preceding sentence. Any Member who takes any action or binds the Company in violation of this Paragraph 4.03 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to such loss or expense.

**Paragraph 4.04  Liability for Certain Acts.**  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, breach of his duties or willful misconduct by the Manager.

**Paragraph 4.05  Manager Has No Exclusive Duty to Company.** The Manager shall not be required to manage the Company as its sole and exclusive function, and it may have other business interests and engage in activities in addition to those relating to the Company, including activities that may be competitive with the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

**Paragraph 4.06  Indemnity of the Manager.**

(a)      Subject to the limitations and conditions provided in this Paragraph 4.06, each Person ("Indemnified Person") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, or a Person of whom he is the legal representative, is or was a Manager of the Company or is or was serving as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another entity that is or was a Manager shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that his conduct was unlawful.

(b)      To the extent that an Indemnified Person has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in Paragraph 4.06 (a), or in defense of any claim, issue or matter therein, he will be indemnified against expenses (including attorneys' fees) actually and reasonably incurred in connection therewith.

(c)      Any indemnification under this Paragraph 4.06 (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification is proper in the circumstances because the Indemnified Person has met the applicable standard of conduct set forth therein. Such determination shall be made by the Members who were not parties to or subjects of such threatened or actual Proceeding. If there are

9

no disinterested Members, then the determination shall be made by the Company's independent legal counsel, whose fees must be paid by the Company.

(d)    Indemnification under this Paragraph 4.06 shall continue as to an Indemnified Person who has ceased to serve in the capacity which initially entitled such Indemnified Person to indemnity hereunder. The rights granted pursuant to this Paragraph 4.06 shall be deemed contract rights, and no amendment, modification or repeal of this Paragraph 4.06 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

(e)    The right to indemnification conferred by this Paragraph 4.06 shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Paragraph 4.06 and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Paragraph 4.06 or otherwise.

**Paragraph 4.07 Compensation and Expenses.** No Member or Manager shall be entitled to compensation or reimbursement from the Company for direct out-of-pocket expenses incurred on behalf of the Company without the prior approval of the Manager.

**Paragraph 4.08 Execution of Documents.** Any document or instrument of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind the Company or convey or encumber title to its real or personal property shall be valid and binding for all purposes only if executed by the Manager.

**Paragraph 4.09 Resignation.** Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

## ARTICLE V
## GENERAL RIGHTS AND OBLIGATIONS OF MEMBERS

**Paragraph 5.01 Limitation of Liability.** Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

10

Paragraph 5.02  **Company Debt Liability.** A Member will not be personally liable for any debts or losses of the Company beyond his or her respective Capital Contributions except as otherwise required by law.

Paragraph 5.03  **List of Members.** Upon the written request of any Member, the Manager shall provide a list showing the names, addresses and Membership Interests of all Members.

Paragraph 5.04  **Company Books.** The Manager will maintain and preserve, during the term of the Company, the accounts, books, and other relevant Company documents described in Paragraph 8.08 or required to be kept by Section 18-305 of the Act. Upon reasonable written request, each Member shall have the right, at any time during ordinary business hours, as reasonably determined by the Manager, to inspect and copy, at the requesting Member's expense, the Company documents identified in Section 18-305 of the Act, and such other documents which the Manager, in its discretion, deems appropriate.

Paragraph 5.05  **Priority and Return of Capital.** Except as may be expressly provided in Article VII, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Paragraph 5.05 shall not apply to loans which a Member has made to the Company.

Paragraph 5.06  **Special Status of L&G.**

(a)    L&G, and its successors and assigns, shall have no right to vote on or consent to any matter subject to a vote by or consent of the Members, and its Membership Units shall be excluded from the Membership Units considered for determining Majority Interest.

(b)    If L&G breaches any of its obligations under this Agreement or the Act, the Manager may determine in its sole discretion to take all or any of the following actions:

(i)    to notify L&G that it has ceased to be a Member and will have no further power to exercise any rights under this Agreement, except as an Economic Interest Owner;

(ii)    to notify _____ that it may, within thirty (30) days after receipt of notice from the Manager, elect to purchase the Membership Interest of L&G for the sum of the Capital Contributions it has made to the Company; if _____ exercises this right of purchase, L&G and _____ will consummate the Disposition within thirty (30) days after _____'s election, L&G will transfer its Membership Interest by executing and delivering an assignment with full warranties, free and clear of all liens and encumbrances, and _____ will pay the purchase price in cash; until the Disposition described in this item (ii) shall have been consummated, L&G will continue to be obligated to the Company as provided in this Agreement; and

(iii)    to apply any distributions otherwise payable to L&G to satisfy any claims the Company may have against L&G.

11

## ARTICLE VI
## MEETINGS OF MEMBERS

**Paragraph 6.01  Meetings of and Voting by Members.**

(a)        A meeting of the Members may be called at any time by the Manager. The meeting of Members shall be held at the Company's principal place of business or at any other place designated by the Manager. Not less than five (5) nor more than thirty (30) days before each meeting, the Manager shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Operating Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a Majority Interest shall constitute a quorum. A Member entitled to vote may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

(b)        Except as otherwise provided in this Operating Agreement, the affirmative vote of Members holding a Majority Interest shall be required to approve any matter coming before the Members.

(c)        In lieu of holding a meeting, the Members entitled to vote may vote or otherwise take action by a written instrument indicating the consent of Members holding a Majority Interest.

(d)        In all elections for a Manager, there shall not be cumulative voting.

(e)        The terms of this Article VI may be amended with the consent of a Majority in Interest.

## ARTICLE VII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

**Paragraph 7.01  Members' Initial Capital Contributions.**  Contemporaneously with the execution of this Agreement, each Member will contribute to the Company as its required Initial Capital Contribution the amount set forth on the Schedule of Capital Contributions attached hereto as Exhibit A.  In return for its Initial Capital Contribution, each Member will receive a credit to its Capital Account equal to his Initial Capital Contribution.  If any prospective Member should fail to provide an Initial Capital Contribution as and when required, its Company Interest will thereupon be deemed forfeited, and it will have no further rights under this Agreement or with respect to the Company.

12

**Paragraph 7.02  Capital Accounts.**

(a)      A separate Capital Account will be maintained for each Member. Each Member's Capital Account will be increased by (i) the amount of money contributed by such Member to the Company, including the Special Equity; (ii) the fair market value of the property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); (iii) allocations to such Member of Net Profits; and (iv) allocations to such Member of income described in Code Section 705(a)(1)(B). Each Member's Capital Account will be decreased by (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); (iii) allocations to such Member of expenditures described in Code Section 705(a)(2)(B); and (iv) allocations to such Member of Net Losses.

(b)      In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member or Economic Interest Owner (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations , Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and the book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(c)      In the event of a permitted sale or exchange of a Membership Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(d)      The manner in which Capital Accounts are to be maintained pursuant to this Paragraph 7.02 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Paragraph 7.02 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Paragraph 7.02, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts

13

shall not materially alter the economic agreement between or among the Members as set forth in the Operating Agreement.

**Paragraph 7.03 Withdrawal or Reduction of Members' Contributions to Capital.**

(a)     Each Member agrees not to withdraw as a member of the Company prior to the expiration of the term set forth in Paragraph 2.05 without the approval of the other Member(s). A Member who withdraws as a Member of the Company without the consent of the other Member shall be liable to the Company for any damages suffered by the Company on account of the breach and shall not be entitled to receive any payment for his Interest or a return of his Capital Contribution until the time otherwise provided herein for distributions to Members. A Member shall not receive from the Company any part of his or her Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of his or her Capital Contribution, has only the right to demand and receive cash in return for his or her Capital Contribution.

**Paragraph 7.04 Additional Capital.**

(a)     If the Company should require capital for any reason in addition to any money provided pursuant to Paragraph 7.01 hereof, the Manager may elect either (i) to borrow the needed funds from an independent lender, (ii) to accept from any Member a loan of the required funds, which loan shall be on such terms and conditions as the Manager may determine but may not accrue interest at a rate per annum greater than Prime Rate plus 5% (a "*Member Loan*"), which would be treated as a debt of the Company and not as a Capital Contribution, or (iii) to require each of the Members to provide an additional cash Capital Contribution in an amount equivalent to its Sharing Ratio of the required funds.

(b)     If the Manager requires additional cash Capital Contributions pursuant to the preceding subparagraph, each Member will pay its required additional cash Capital Contribution to the Company within ten (10) days after delivery of notice by the Manager. If a Member fails to provide an additional cash Capital Contribution as and when required, the other Member (or, if there are more than one other Members, then all of such Members in accordance with the determination of a Majority Interest between or among them pursuant to their Sharing Ratios) may elect within twenty (20) days after the date of such Member's failure to fund any one of the following remedies:

(i)     to provide such additional cash Capital Contribution required of the defaulting Member and to cause the Sharing Ratios to be adjusted to reflect the Capital Contributions provided to the Company by the Members, giving a 2X effect to the additional cash Capital Contribution provided to the Company pursuant to this item (i);

(ii)     to provide the required money in the form of a Preferred Capital Contribution;

14

        (iii)     to provide the required money to the Company in the form of a Company Covering Loan; or

        (iv)     to provide the required money to the defaulting Member ("Noncontributing Member") as a Member Covering Loan, which Member ("Contributing Member") will advance the loan proceeds to the Company as the required additional cash Capital Contribution. Member Covering Loan shall be secured by a Lien on the Interest of the Noncontributing Member, which may be enforced by the Contributing Member(s) at law or equity (by foreclosure or otherwise). Member Covering Loans shall be non-recourse to the Noncontributing Member secured solely by its Interest, and the Noncontributing Member hereby grants a security interest in its Interest to the Contributing Member(s) who have advanced such Member Covering Loan and does hereby irrevocably appoint such Contributing Member(s), and any of their agents, officers or employees, as its attorneys-in-fact with full power and authority to prepare and execute any documents, instruments and agreements, including any note evidencing such Member Covering Loan, and such UCC financing statements, continuation statements, and other security instruments as may be appropriate (although no such documents shall be necessary) to perfect and continue such security interest in favor of such Contributing Member(s). Any distributions otherwise payable to the Noncontributing Member under this Agreement shall be applied first to the repayment of the Member Covering Loans (pro rata based on the amount of such Member Covering Loans to each Contributing Member) and the Noncontributing Member shall receive no distributions until such debt is paid in full. The Company is hereby authorized and directed to pay the amount of any such distributions (to the extent of the amount owing by the Noncontributing Member to the Contributing Members, as aforesaid, including interest) to the Contributing Members in repayment of the Member Covering Loans. Any amounts so paid shall be deemed to have been distributed to the Noncontributing Member and then paid to the Contributing Member(s) in repayment of such Member Covering Loans. This Agreement is intended to constitute a security agreement within the meaning of the Uniform Commercial Code. Each Contributing Member shall send written notice of its exercise of the option under this Subparagraph 7.04(b)(iv) to the Company and the Noncontributing Member.

        (v)     to purchase the defaulting Member's Interest for cash in the amount of the Purchase Price.

      **Paragraph 7.05 Creditors.** The provisions of this Article VII are not intended to be for the benefit of any creditor or other person (other than a Member in its capacity as Member) to whom any debts, liabilities or obligations are owed by (who otherwise has any claim against) the Company or any of the Members, and no such creditor or other person shall obtain any right under any such provisions or shall by reason of any such provisions make any claim in respect of any debt, liability, obligation or claim against the Company or any of the Members.

      **Paragraph 7.06 Generally.** No Member shall be entitled to withdraw any part of its Capital Contributions or Capital Account or to receive any distribution from the Company except as specifically provided in this Agreement. Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the

Company.  Except as otherwise provided in this Agreement or the Act, no Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

## ARTICLE VIII
## ALLOCATIONS, INCOME TAX,
## DISTRIBUTIONS, ELECTIONS AND REPORTS

**Paragraph 8.01  Allocations of Net Profits and Net Losses.**

(a)     After giving effect to the special allocations set forth in Paragraph 8.02 hereof, Net Profits for any Fiscal Year will be allocated to the Members in accordance with the following order:

(i)     first, to the Members in the reverse order of the allocation of Net Losses and in the same ratio as originally made within each level of priority under Paragraph 8.01(b) until the cumulative Net Profits allocated to them pursuant to this Paragraph 8.01(a) for the current and all prior Fiscal Years are equal to the cumulative Net Losses allocated to them pursuant to Paragraph 8.01(b) hereof for all prior Fiscal Years; and

(ii)     the balance, if any, to the Members in accordance with their Sharing Ratios.

(b)     After giving effect to the special allocations set forth in Paragraph 8.02 hereof, Net Losses for any Fiscal Year will be allocated in accordance with the following order, subject to the limitation in Paragraph 8.01(c) below:

(i)     first, to the Members in proportion to the amount of and until the cumulative Net Losses allocated to them pursuant to this Subparagraph (i) for the current and all prior Fiscal Years are equal to the cumulative Net Profits, if any, allocated pursuant to Paragraph 8.01(a) for all prior Fiscal Years;

(ii)     second, among the Members in portion to and to the extent of the positive balance in their Capital Accounts; and

(iii)     the balance, if any, to the Members in accordance with their Sharing Ratios.

(c)     The Net Losses allocated to the Members pursuant to Paragraph 8.01(b) will not exceed the maximum amount of Net Losses that can be so allocated without causing any of the Members to have an Adjusted Capital Account Deficit at the end of any such Fiscal Year.  The limitations set forth in this Paragraph 8.01(c) will be applied so as to allocate the maximum permissible Losses to the Members under Treasury Regulations §1.704-1(b)(2)(ii)(d).

16

**Paragraph 8.02  Special Allocations.**  The following special allocations will be made in the following order:

(a)  (Minimum Gain Chargeback)  Notwithstanding any other provision of this Article VIII, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Treasury Regulations §1.704-2(g)(2).  Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated will be determined in accordance with Treasury Regulations §§1.704-2(f)(6) and 1.704-2(j)(2).  This Subparagraph (a) is intended to comply with the minimum gain chargeback requirement in §1.704-2(f) of the Treasury Regulations and will be interpreted consistently therewith.

(b)  (Member Nonrecourse Debt Minimum Gain Chargeback)  Except as otherwise provided in Treasury Regulation §1.704-2(i)(4), notwithstanding any other provision of this Article VIII, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations §1.704-2(i)(5), will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain determined in accordance with Treasury Regulations §1.704-2(i)(4).  Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated will be determined in accordance with Treasury Regulations §§1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations.  This Subparagraph (b) is intended to comply with the minimum gain chargeback requirement in §1.704-2(i)(4) of the Treasury Regulations and will be interpreted consistently therewith.

(c)  (Qualified Income Offset)  In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain will be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Subparagraph (c) will be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VIII have been tentatively made as if this Subparagraph (c) were not in the Agreement.

(d)  (Gross Income Allocation)  In the event that any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Treasury Regulations §1.704-2(g)(1) and 1.704-2(i)(5), such Member will be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this

17

Subparagraph (d) will be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VIII have been tentatively made as if Subparagraph (b) hereof and this Subparagraph (d) were not in the Agreement.

(e)    (Section 754 Adjustments)    To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code §734(b) or Code §743(b) is required, pursuant to Treasury Regulations §§1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulations §1.704-1(b)(2)(iv)(m)(2) applies or to the Member to whom such distribution was made in the event Treasury Regulations §1.704-1(b)(2)(iv)(m)(4) applies.

(f)    (Nonrecourse Deductions)    Nonrecourse Deductions for any Fiscal Year or other period will be specially allocated to the Members in accordance with the Sharing Ratios.

(g)    (Member Nonrecourse Deductions)    Member Nonrecourse Deductions for any Fiscal Year or other period will be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations §1.704-2(i)(1).

(h)    (Curative Allocations)    The allocations set forth in Paragraph 8.01(a), Paragraph 8.01(b), Subparagraphs (a), (b), (c), (d), (e), (f) and (g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Subparagraph (h). Therefore, notwithstanding any other provision of this Article VIII (other than the Regulatory Allocations), the Manager will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Paragraphs 8.02(a) and (b)(i). In exercising its discretion under this Subparagraph (h), the Manager will take into account future Regulatory Allocations under Paragraphs 8.02(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Paragraphs 8.02(f) and (g).

**Paragraph 8.03 Allocation of Net Profits and Net Losses Upon Transfer or Change in Membership Interests.** It is agreed that if all or a portion of a Member's Membership Interest is transferred or adjusted as permitted herein, Net Profits and Net Losses for the Fiscal Year of the transfer shall be allocated between the transferor and the transferee based upon the number of days in said Fiscal Year each owned such Membership Interest, without regard to the dates upon

18

which income was received or expenses were incurred during said Fiscal Year, except as otherwise required by the provisions of Code Section 706 and Treasury Regulations promulgated thereunder.

**Paragraph 8.04  Contributed Property.** Notwithstanding anything contained herein to the contrary, if a Member contributes property to the Company having a fair market value that differs from its adjusted basis at the time of contribution, then items of income, gain, loss and deduction with respect to the property shall be shared among the Members so as to take account of the variation between the adjusted tax basis of the property to the Company and its fair market value at the time of contribution, in the manner prescribed in Code Section 704(c) and the Treasury Regulations promulgated thereunder.

**Paragraph 8.05  Distributions of Cash Flow.** It is anticipated that there will be no distributions of Cash Flow to the Members unless and until the Company shall have sold the Property, which liquidating distributions will be governed by Paragraph 10.02(b)(3) hereof. Distributions of Cash Flow before liquidation may be made by the Manager (a) in its sole and absolute discretion or (b) if determined by the Manager to be a liquidating distribution as set forth in Subparagraoh 10.02(b) to the Members in such order as it may determine appropriate.

**Paragraph 8.06  Limitation upon Distributions.**

(a)      No distribution or return of capital contributions may be made and paid if, after the distribution or return of a capital contribution, either:

(1)      the Company would be insolvent; or

(2)      the net assets of the Company would be less than zero.

(b)      The Manager may base a determination that a distribution or return of a Capital Contribution may be made under Paragraph 8.06(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

**Paragraph 8.07  Loans to Company.** Nothing in this Operating Agreement prevents any Member from making secured or unsecured loans to the Company by agreement with the Manager.

**Paragraph 8.08  Records, Audits and Reports.** At the expense of the Company, the Manager shall maintain records and accounts of the operations and expenditures of the Company. At a minimum, the Company will keep at its principal place of business the following records:

(a)      A current list of the full name and last known address of each Member setting forth the amount of cash each Member has contributed, a description and statement of the agreed

19