value of the other property or services each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member;

(b)      A copy of the Certificate of Formation of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)      Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years and of any financial statements of the Company for the three (3) most recent years; and

(d)      Copies of the Company's currently effective written Operating Agreement and all amendments thereto.

**Paragraph 8.09  Returns.** The Manager must cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, will be furnished to the Members within a reasonable time after the end of the Company's Fiscal Year.

**Paragraph 8.10  Tax Elections.** The Company will make the following tax elections:

(a)      To be treated as a partnership for federal income tax purposes;

(b)      To adopt the calendar year as the Company's tax and Fiscal Year;

(c)      To adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method;

(d)      If a distribution of Company Property as described in Section 734 of the Code should occur or if a transfer of a Company Interest as described in Section 743 of the Code should occur, on request by Notice from any Member, to elect, pursuant to Section 754 of the Code, if such election has not been previously made, to adjust the basis of Company Property; provided that the Manager may require the Member(s) (or his or their successor) requesting such election to reimburse the Company for any additional expense incurred as a result of such election;

(e)      To elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code; and

(f)      Any other election that the Manager may deem appropriate and in the best interests of the Company.

**Paragraph 8.11  Tax Matters Partner.** The Manager is designated the "Tax Matters Partner" (as defined in Code Section 6231) and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's

affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do, or refrain from doing, any and all things reasonably required to conduct such proceedings. The Tax Matters Partner will ensure that each Member, if he or she has so requested, is made a notice partner within the meaning of Section 6223 of the Code.

**ARTICLE IX**
**DISPOSITIONS OF INTERESTS**

### Paragraph 9.01  Prohibition.

(a)    Except as otherwise permitted or required by this Agreement, no Member may make or consent to a Disposition of his Membership Interest, and an assignee of a Membership Interest will not become a Member unless approved by a Majority Interest. Each Member acknowledges the reasonableness of the restrictions on the Disposition of his Membership Interest imposed by this Agreement in view of the Company purposes and the relationship among the Members. Each Member hereby further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any costs, liability or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Disposition or an attempted Disposition of Membership Interest in violation of this Agreement and efforts to enforce the indemnity granted hereby. Accordingly, the restrictions on Disposition of Membership Interests contained herein will be specifically enforceable.

(b)    If at any time Edie Laquer is not the sole Manager with the sole authority to act on behalf of L&G, a prohibited Disposition shall be deemed to have occurred, which shall constitute a default hereunder by L&G, and in any event L&G shall thenceforth be treated as a transferee which has not been admitted as a substituted Member.

### Paragraph 9.02  Permitted Transfers.
Each Member may sell, give or bequeath all or any part of his Membership Interest to any other Member without restriction of any kind. Furthermore, each Member may sell, give or bequeath all or any part of his Economic Interest to such Member's spouse, children or heirs, or trusts for his own or their benefit, or to any entity owned or controlled by such persons or entities. The rights accorded each Member under this Paragraph 9.02 may also be exercised by any successor, executor, administrator, spouse, child or heir who may have succeeded to a Member's interest.

### Paragraph 9.03  Right of First Refusal.

(a)    Except with respect to transfers described in Paragraph 9.02, if L&G desires to sell all or any portion of its Membership Interest or Economic Interest ("Offered Interest"), it shall obtain from the purchaser a bona fide written offer ("Offer") to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor which must be payable in money. L&G shall give written notification to the

21

remaining Members, by certified mail or personal delivery, of its intention to transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer and, if such purchaser is not a public company, reasonable biographic and financial information for the purchaser.

(b)     The remaining Members, and each of them, on a basis pro rata to their Sharing Ratios or on a basis pro rata to the Sharing Ratios of those remaining Members exercising their right of first refusal, have the right to exercise a right of first refusal to purchase all (but not less than all) of the Offered Interest upon the same terms and conditions as stated in the Offer by giving written notification to L&G, by certified mail or personal delivery, of their intention to do so within forty-five (45) days after receiving written notice from L&G (the "Option Period"). The failure of at least one of the remaining Members to so notify L&G of its desire to exercise this right of first refusal within said forty-five (45) day period will terminate the right of first refusal as to such Offer and L&G may thereafter consummate the sale of the Offered Interest, but only to the purchaser identified in the Offer and on the terms contained in the Offer, and provided that the sale must be consummated within sixty (60) days following the expiration of the Option Period.

(c)     If any one or more of the remaining Members give written notice to L&G of their desire to exercise their right of first refusal and to purchase the Offered Interest upon the same terms and conditions as are stated in the Offer, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the expiration of the Option Period.

**Paragraph 9.04  L& G's Tag Along Rights.** If_____ has determined to transfer all of its Membership Interest to a third party, it shall notify (the "*Tag Along Notice*") L&G of such intended transfer and the name and contact information for the prospective purchaser. If L&G wishes to do so, it may elect also to transfer its Membership Interest to such purchaser by delivering an offer notice to _____ and such purchaser within fifteen (15) days after L & G has received the Tag Along Notice. In this event, the purchaser will be obligated to purchase L & G's Membership Interest at a price based on the price to be received by _____ and on the same terms and conditions applicable to _____.

**Paragraph 9.05  Sale of the Company.**

(a)     If a Majority Interest wishes to accept an offer to purchase all of the Interests of the Company (an "*Approved Sale*"), (i) each Member shall vote for, consent to and raise no objections against, and waive any dissenters or appraisal rights with respect to, such Approved Sale, and each Member shall consummate such Approved Sale on the terms and conditions so approved, and (ii) each Member shall take all necessary or desirable actions in connection with the consummation of the Approved Sale.

(b)     Each Member shall be severally obligated to join and become a party to any agreement approved by a Majority Interest with respect to an Approved Sale (on a pro rata basis) providing for representations and warranties, indemnification obligations (including escrows,

22

holdback or other similar arrangements to support such indemnity obligations), releases or other obligations to which a Majority Interest agrees in connection with such Approved Sale (other than any such obligations that relate specifically to a Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Membership Interests as to which obligations each such Member shall be solely liable). Each Member (A) hereby appoints the Manager or its designee as its representative in connection with any sale agreement with customary provisions (including the right to resolve any potential indemnification claims or other disputes on behalf of all Members) and (B) hereby irrevocably grants to, and appoints, the Manager or its designee, such Member's proxy and attorney-in-fact (with full power of substitution) for and in the name, place and stead of such Member, to vote the Membership Interests held by such Member, or to grant a consent or approval with respect to such Membership Interest, in connection with any meeting of the Members or any action by written consent in lieu of a meeting of the Members with respect to an Approved Sale. Each Member hereby affirms that the irrevocable proxy set forth in this Paragraph 9.04(b) is given to secure the performance of the duties of such Member under this Agreement. Each Member hereby further affirms that the irrevocable proxy set forth in this Paragraph 9.04 is coupled with an interest and irrevocable.

(c)     In the event of a sale or exchange by the Members of all or substantially all of the Membership Interests held by the Members (whether by sale, merger, recapitalization, reorganization, consolidation, combination or otherwise), each Member shall receive in exchange for the Membership Interest held by such Member the same portion of the aggregate consideration from such sale or exchange that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth herein as in effect immediately prior to such or exchange. Each Member shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from such sale or exchange as requested by the Company.

**Paragraph 9.06  Effect of Transfer.**

(a)     As a condition to the Company recognizing the effectiveness of any transfer permitted hereunder, the Manager shall require the transferring Member or the transferee, as the case may be, to execute, acknowledge and deliver such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Manager may deem necessary or desirable to:

(1)     verify the transfer;

(2)     confirm that the person desiring to acquire an Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Operating Agreement (whether or not such Person is to be admitted as a new Member);

(3)     maintain the status of the Company as a partnership; and

23

(4)    assure compliance with any applicable state and federal laws, including but not limited to securities laws and regulations.

(b)    Any transfer of a Membership Interest or admission of a Member in compliance with this Article IX shall be deemed effective as of the last day of the calendar month in which the Members' consent thereto was given. The transferring Member agrees, upon request of the Manager, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the Manager from time to time in connection with such transfer. The transferring Member hereby agrees to indemnify the Manager, and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article IX.

**Paragraph 9.07  Transferee Not Member in Absence of Consent.** Notwithstanding anything contained herein to the contrary (including, without limitation, Paragraph 9.02 and Paragraph 9.03 hereof), a transferee of a Membership Interest shall have no right to participate in the management of the business and affairs of the Company or to become a Member unless the transfer and the transferee's admission is approved by the Manager.

**Paragraph 9.08  Resignation of a Member.** Upon the resignation of a Member, that Member is not entitled to be paid for his Membership Interest and is not entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such event not occurred.

**Paragraph 9.09  Interests in Member.** A Member that is not a natural person may not cause or permit an ownership interest, direct or indirect, in itself to be disposed of such that, after the disposition: (a) the Company would be considered to have terminated within the meaning of Section 708 of the Code; or (b) that Member ceases to be controlled by the same Persons who control it as of the date of the Member's admission to the Company. For a period of 120 days after notice to the Company of any Member's breach of the provisions of this Paragraph 9.08, the Company will have the option to buy, and on exercise of that option the breaching Member must sell, the breaching Member's Membership Interest, at a price equal to the Capital Account balance of the breaching Member. The breaching Member must deliver documents satisfactory to the Company conveying its Membership Interest free and clear of all liens, claims and encumbrances.

## ARTICLE X
## DISSOLUTION AND TERMINATION

**Paragraph 10.01  Dissolution.**

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(1)    the expiration of the term fixed pursuant to Paragraph 2.05 hereof; or

24

      (2)     by the written consent of a Majority Interest.

The Company shall not be dissolved upon the death, incompetency, retirement, resignation, expulsion, dissolution or bankruptcy of a Member.

      (b)     If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

**Paragraph 10.02  Winding Up, Liquidation and Distribution of Assets.**

      (a)     Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall promptly proceed to wind up the affairs of the Company.

      (b)     If the Company is dissolved and its affairs are to be wound up, the Manager is directed to:

          (1)     sell or otherwise liquidate such of the Company's assets as may be required to discharge all liabilities of the Company, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such Reserves shall be deemed to be an expense of the Company);

          (2)     allocate any profit or loss resulting from such sales to the Capital Accounts in accordance with Article VIII hereof; and

          (3)     distribute the remaining assets in accordance with the following priorities:

             (i)     First, to the Members in payment of Member Loans, in reverse chronological order with accrued interest and then unpaid principal of the most recent Member Loan being paid first;

             (ii)     Second, to the Members in payment of Company Covering Loans, in reverse chronological order with accrued interest and then unpaid principal of the most recent Company Covering Loan being paid first;

             (iii)     Third, to the Members in payment of Preferred Capital Return, pro rata in accordance with the total sums due the Members so that the full amount of the Preferred Capital Return due them is discharged simultaneously;

25

(iv)    Fourth, to the Members in payment of Preferred Capital, pro rata in accordance with the total sums due the Members so that the full amount of the Preferred Capital due them is discharged simultaneously; and

(v)    Fifth, to the positive balance (if any) of each Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs), and

(vi)    The balance, to the Members in accordance with their Sharing Ratios.

Such distributions shall be made either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined by the Manager. Any such distributions in respect of Capital Accounts must be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations. The Company may offset damages for breach of this Operating Agreement by a Member whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(c)    Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

(d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(e)    The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

(f)    Provisions herein to the contrary notwithstanding, if a Member is entitled to a distribution from the Company at a time when it is obligated to another Member on a Member Covering Loan, the Company will apply the proceeds otherwise payable to such Member first in payment of accrued interest and then unpaid principal due on the Member Covering Loan.

**Paragraph 10.03 Certificate of Cancellation.** When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation, as required by the Act, shall be executed and filed with the Delaware Secretary of State.

26

**Paragraph 10.04  Effect of Filing of Certificate of Cancellation.** Upon the filing of a certificate of cancellation with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

**Paragraph 10.05  Return of Contribution Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

**Paragraph 11.01  Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement to be effective must be in writing and delivered personally to the party, or to an officer or partner of a party that is an Entity, by certified mail, return receipt requested, postage and charges prepaid, by telephone facsimile or by overnight courier service, such as Federal Express, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given on the date of hand-delivery, two (2) business days after the date on which the same was deposited in the United States mail, addressed and sent as aforesaid, on the day of telephone facsimile and confirmed receipt (provided, however, if receipt has been confirmed after 5 p.m. on any day, delivery will be deemed on the following business day) and on the date of the addressee's receipt if by overnight courier service.

**Paragraph 11.02  Application of Delaware Law.** This Operating Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Delaware and specifically the Act.

**Paragraph 11.03  Waiver of Action for Partition.** Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

**Paragraph 11.04  Amendments.** Except as otherwise provided herein, this Operating Agreement may not be amended except in writing signed by all of the Members.

**Paragraph 11.05  Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

27

**Paragraph 11.06  Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

**Paragraph 11.07  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**Paragraph 11.08  Waivers.** No party's undertakings or agreements contained in this Operating Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of the other Member. Failure of a party to insist on strict compliance with the provisions of this Operating Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Operating Agreement. A waiver of a breach of this Operating Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Operating Agreement.

**Paragraph 11.09  Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

**Paragraph 11.10  Severability.** If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**Paragraph 11.11  Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Paragraph 11.12  Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company, the Members or the Economic Interest Owners.

**Paragraph 11.13  Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**Paragraph 11.14  Confidentiality.** L&G acknowledges that the success of the Company's business may be dependent in material part upon the Company's purchase of the Property not becoming public knowledge. Accordingly, without the prior written consent of the Manager, L&G shall keep confidential and not disclose to any person any aspect of the

28

Company's business or the identity of any Member or any Member's Affiliates.  L&G may, however, disclose such confidential information to its representatives, such as its attorney, so long as it requires each such representative to maintain the absolute confidentiality of all such information.

**Paragraph 11.15  Legal Representation.**  The Company may retain one or more legal counsel (the "*Law Firm*") from time to time to represent the Company on specific matters, and the Members hereby recognize and acknowledge that such representation of the Company shall not establish any attorney-client relationship between the Members and the Law Firm.  It is further acknowledged and agreed by the Members that any Law Firm representing the Company may also represent the Manager, any Member and any Affiliate of the Manager or any Member.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Members have executed this Operating Agreement on the date first written above.

LADIES & GENTLEMEN LLC

By:_____
    Edie Laquer, Manager


_____, LLC

By:    _____, LLC,
    its Manager

        By:_____
        _____, as its
        _____

## SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS AND
## MEMBERSHIP UNITS

| Member's Name and Contact Information | Initial Capital Contribution | Membership Units |
|---|---|---|
| Ladies & Gentlemen LLC c/o Edie Laquer Wachovia Financial Center 200 South Biscayne Boulevard Suite 2930 (temporary Suite #2770) Miami, Florida 33131 | $_____ | 100 |
| _____, LLC 823 University Boulevard Suite 204 Jupiter, Florida 33458 | $_____ | 900 |

## Exhibit A

**PARTICIPATING ENTITY DOCUMENTS**

**Schedule C**

# OPERATING AGREEMENT

## OF

_____, LLC

### A Delaware Limited Liability Company

THIS OPERATING AGREEMENT is made and entered into as of the _____ day of _____, 200__, (a) adopted by the Manager (as defined below) and (b) executed and agreed to by _____, a Florida limited liability company ("_____") and _____ ("Laquer Entity").

## ARTICLE I
## DEFINITIONS

The following terms used in this Operating Agreement shall have the following meanings:

**"Act"** shall mean the Delaware Limited Liability Company Act, as amended from time to time.

**"Adjusted Capital Account Deficit"** shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(i)      Credit to such Capital Account any amount which such Member is obligated to restore pursuant to Treasury Regulations §1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)      Debit to such Capital Account the items described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), (5) and (6).

**"Affiliate"** of another Person means: (a) any entity or individual that directly or indirectly controls or holds the power to vote 10% or more of the outstanding voting securities of the Person in question; (b) any Person 10% or more of whose voting securities are directly or indirectly owned, controlled or held with power to vote, by such other Person; (c) any Person directly or indirectly controlling, controlled by, or under common control with such other Person; (d) any officer, director or partner of such other Person; and (e) if such other Person is an officer, director or partner, any company for which such Person acts in any such capacity.

**"Capital Account"** as of any given date shall mean the Capital Contribution to the Company by a Member as adjusted up to such date pursuant to Article VII.

"**Capital Contribution**" shall mean any contribution to the capital of the Company in cash or property by a Member whenever made.

"**Cash Flow**" shall mean the excess of cash receipts over cash disbursements, including the payment of Company debt, determined by the Manager; provided that: (i) cash receipts shall not include: (a) contributions to capital; (b) loan proceeds or other funds used to pay for the repayment of existing debt and the acquisition of capital assets or to maintain working capital; (c) insurance proceeds (other than from business interruption insurance) received on account of loss or damage to the property and proceeds received on account of any condemnation or taking of all or any part of the Company's property to the extent used or designated for use to repair, replace or restore the property; and (d) funds from Reserve accounts applied for the purpose of the Reserve but excluding those deemed surplus by the Manager; and (ii) cash disbursements shall not include: (a) distributions of Cash Flow made pursuant to Article VIII hereof; and (b) payments out of or charged against Reserve accounts; but cash disbursements shall include annual charges for Reserves.

"**Cause**" shall mean (i) committing a willful or grossly negligent act or an act of fraud which adversely affects the Company or (ii) committing a felony or other criminal act of moral turpitude.

"**Certificate of Formation**" shall mean the Certificate of Formation of the Company, filed in the office of the Secretary of State of Delaware, for the purpose of forming a limited liability company, as amended from time to time.

"**Code**" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"**Company**" shall refer to _____, LLC.

"**Company Covering Loan**" shall mean the loan of money to the Company by a Member pursuant to Paragraph 7.04(b)(iii), which loan will accrue interest at the rate of 20% per annum and shall be due and payable as provided in this Agreement.

"**Company Minimum Gain**" shall have the meaning set forth in Treasury Regulations §§1.704-2(b)(2) and 1.704-2(d) for "partnership minimum gain".

"**Development Entity**" shall mean _____.

"**Dispose**", "**Disposing**" or "**Disposition**" shall mean a sale, assignment, transfer, gift, exchange, mortgage, pledge, granting of a security interest or other disposition or encumbrance, or the acts thereof.

"**Economic Interest**" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Operating Agreement and the Act, but shall not include any right to participate in

2

the management or affairs of the Company, including the right to vote on, consent to or otherwise participate in any decision of the Members.

"Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

"Entity" shall mean any general partnership, limited partnership, limited liability partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust, foreign business organization or other business entity.

"Fiscal Year" shall mean the period terminating on December 31 of each year during the term hereof or on such earlier date in any year in which the Company shall be dissolved as provided herein.

"Gross Asset Value" shall mean  with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(i)      the initial Gross Asset Value of any asset contributed by a Member to the Company will be the gross fair market value of such asset determined with the approval of the Majority in Interest;

(ii)      the Gross Asset Values of all Company assets will be adjusted to equal their respective gross fair market values, as determined by the Manager, as of the following times: (a) the acquisition of an additional interest in the Company by any new or existing Member in exchange for more than a de minimis Capital Contribution; (b) the distribution by the Company to a Member of more than a de minimis amount of the property as consideration for an interest in the Company; and (c) the liquidation of the Company within the meaning of Treasury Regulations §1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (a) and (b) above will be made only if the Company's accountants determine that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)      the Gross Asset Value of any Company asset distributed to any Member will be the gross fair market value (taking Code §7701(g) into account) of such asset on the date of distribution; and

(iv)      the Gross Asset Value of Company assets will be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code §734(b) or Code §743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Treasury Regulations §1.704-1(b)(2)(iv)(m) and Section 10.4 hereof; provided, however, that Gross Asset Values will not be adjusted pursuant to this paragraph (iv) to the extent the Members determine that an adjustment pursuant to paragraph (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (iv).

3

If the Gross Asset Value of an asset has been determined or adjusted pursuant to paragraph (i), (ii) or (iv) above, such Gross Asset Value will thereafter be reduced by any depreciation taken into account with respect to such asset in computing Net Profits and Net Losses.

**"Initial Capital Contribution"** shall mean the initial contribution to the capital of the Company pursuant to Paragraph 7.01 of this Operating Agreement.

**"Majority Interest"** means one or more Members holding more than 50% of the Membership Units owned by the Members, other than [Laquer Entity].

**"Manager"** shall mean the Person designated in Paragraph 4.02 to manage and control the business of the Company. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

**"Member"** shall mean each of the parties who executes a counterpart of this Operating Agreement as a Member and each of the parties who may hereafter become a Member. The Members and their respective Interests are set forth on attached and incorporated Exhibit A.

**"Member Covering Loan"** shall mean the loan of money to a Member pursuant to Paragraph 7.04(b)(iv), accruing interest at the rate of 20% per annum and being payable as to interest on demand but no more frequently than every three (3) months and as to principal _____ (__) months after the date the funds are advanced.

**"Member Loan"** shall mean the loan of money to the Company as described in Paragraph 7.04(a) which shall be payable as provided in this Agreement.

**"Member Nonrecourse Debt"** shall have the meaning set forth in Treasury Regulations §1.704-2(b)(4) for "partner nonrecourse debt".

**"Member Nonrecourse Debt Minimum Gain"** shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Treasury Regulations §1.704-2(i)(3).

**"Member Nonrecourse Deductions"** shall have the meaning set forth in Treasury Regulations §§1.704-2(i)(1) and 1.704-2(i)(2) for "partner nonrecourse deductions".

**"Membership Interest"** or **"Interest"** shall mean the membership interest or interest of a Member in the Company, including the right to any and all benefits to which such Member may be entitled in accordance with this Operating Agreement, and the obligations as provided in this Operating Agreement and the Act.

**"Membership Units"** shall mean one or more units owned by a Member out of the 1,000 authorized Membership Units, as designated on attached Exhibit A. Each Membership Unit represents a percentage ownership in the Company. Such percentage is computed by dividing

4

the number of Membership Units owned by a Member by the total number of issued and outstanding Membership Units. Holders of Membership Units shall be entitled to vote on all matters on which Members may vote or consent in this Agreement or under the Act.

**"Net Profits"** and **"Net Losses"** shall mean the income, gain, loss, deductions and credits of the Company in the aggregate or separately stated, as appropriate, as of the close of each Fiscal Year on the Company's tax return filed for federal income tax purposes.

**"Nonrecourse Deductions"** shall have the meaning set forth in Treasury Regulations §1.704-2(b)(1).

**"Operating Agreement"** shall mean this Operating Agreement as originally executed and as amended from time to time.

**"Person"** shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such "Person," where the context so permits.

**"Preferred Capital Contribution"** shall mean the cash Capital Contribution provided to the Company by a Member pursuant to Paragraph 7.04(b)(ii), which shall accrue Preferred Capital Return and be payable as provided in this Agreement.

**"Preferred Capital Return"** shall mean 20% per annum.

**"Prime Rate"** shall mean the rate of interest known as the "prime rate" as published from time to time by the Wall Street Journal under the heading "Money Rates", or any similar rate published by any successor, adjusted on a daily basis, calculated on the basis of the number of days in the particular year with twelve (12) months, each of which has the number of days designated on the calendar applicable to the year in question.

**"Property"** means the ± _____ acre improved parcel described on attached Exhibit B.

**"Purchase Price"** shall mean for Paragraph 5.06 the sum of all monies contributed or loaned by [Laquer Entity] to the Company.

**"Reserves"** shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Manager for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

**"Sharing Ratio"** shall mean the percentage that each Member's number of Membership Units bears to all outstanding Membership Units.

**"Treasury Regulations"** shall include proposed, temporary and final regulations promulgated under the Code.

5

## ARTICLE II
## FORMATION OF COMPANY

**Paragraph 2.01  Formation.** The Company shall be, or has been, organized as a Delaware limited liability company by executing a Certificate of Formation, and filing same in the office of the  Delaware Secretary of State in accordance with and pursuant to the Act.

**Paragraph 2.02  Name.** The name of the Company is _____, LLC.

**Paragraph 2.03  Principal Place of Business.** The principal place of business of the Company is 1951 N.W. 19th Street, Suite 200, Boca Raton, Florida  33431. The Company may locate its places of business and registered office at any other place or places as the Manager may deem advisable.

**Paragraph 2.04  Registered Office and Registered Agent.**
The Company's initial registered office shall be at the office of its registered agent at _____, Wilmington, Delaware _____. Its initial registered agent shall be _____. The registered office and registered agent may be changed by the Members by filing the address of the new registered office and/or the name of the new registered agent with the Delaware Secretary of State pursuant to the Act.

**Paragraph 2.05  Term.** The Company commenced on the date of filing of the Certificate of Formation with the Delaware Secretary of State and shall continue in perpetuity or such earlier time as may be determined in accordance with the terms of this Operating Agreement.

**Paragraph 2.06  Independent Activities.** Each Member may, notwithstanding this Agreement, engage in or possess any interest in any business venture or activity of any nature or description whatsoever, independently or with others, whether the same be competitive with the Company's business or otherwise, without having or incurring any obligation to offer any interest in such other business or activity to the Company or any other Member.  As a material part of the consideration for the execution of this Agreement, each Member hereby waives, relinquishes and renounces any right or claim of participation in any business or activity of the other Members or their affiliates and the income or profits derived therefrom.  Laquer acknowledges the other Member(s) may have interests, direct or indirect, in properties adjacent or near to the Property and that the Manager, or its Affiliates, may be responsible for managing and controlling the business of other companies which own properties adjacent or near to the Property and that this Paragraph is intended to reflect her waiver and release of any claim against or interest in such other properties and operations.

6

## ARTICLE III
## BUSINESS OF COMPANY

**Paragraph 3.01  Purpose.** The business of the Company shall be to own an interest in the Development Entity, which will own and develop the Property, and to engage in such other lawful activities as are reasonably necessary or useful to the furtherance of the foregoing purpose.

## ARTICLE IV
## RIGHTS AND DUTIES OF MANAGER

**Paragraph 4.01  Management.** The business and affairs of the Company will be managed by one Manager, who may, but need not, be a Member. The Manager is authorized and empowered to manage and control the business of the Company. Except for situations in which the approval of the Majority in Interest is expressly required by this Operating Agreement or by nonwaivable provisions of the Act, the Manager has full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

**Paragraph 4.02  Manager.**

(a)  _____ is designated to serve as the Manager and shall continue to serve as the Manager until its resignation or removal for Cause. In the event the Manager ceases to act as Manager for any reason, the succeeding Manager shall be elected by vote of the Majority in Interest.

(b)  The Manager may appoint officers who shall serve and continue in such office for the term of the Company, unless sooner replaced by the Manager or removed by operation of law or by order or decree of any court of competent jurisdiction.

**Paragraph 4.03  Certain Powers of Manager.** Without limiting the generality of Paragraph 4.01, the Manager shall have the power and authority on behalf of the Company to:

(a)  exercise and perform the rights and obligations of an owner of the Development Entity, including, without limitation, performing management duties;

(b)  acquire any real or personal property from any Person, whether or not such Person is directly or indirectly affiliated or connected with the Manager or any Member;

(c)  borrow money for the Company from banks, other lending institutions, the Manager, Members, or Affiliates of the Manager or Members on such terms as the Manager deems appropriate, and in connection therewith, to hypothecate, mortgage, encumber and grant security interests in the assets of the Company to secure repayment of the borrowed sums;

7

(d)     construct, operate, maintain and improve any real and personal property owned by the Company;

(e)     prepay, in whole or in part, refinance, amend, modify or extend any mortgages or trust deeds affecting the assets of the Company and in connection therewith to execute for and on behalf of the Company any extensions, renewals or modifications of such mortgages or trust deeds;

(f)     purchase liability and other insurance to protect the Company's property, business, employees, officers and agents, including the Manager;

(g)     hold and own Company real and personal properties in the name of the Company;

(h)     invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(i)     sell, exchange or otherwise dispose of all or substantially all of the assets of the Company as part of a single transaction or plan at such price and upon such terms as the Manager may determine in its sole discretion;

(j)     execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trusts; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments and bills of sale; leases; and any other instruments or documents necessary or desirable to the business of the Company;

(k)     employ accountants, legal counsel, managing agents, tradesmen, contractors, subcontractors or other Persons to perform services for the Company;

(l)     enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve; and

(m)     do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Operating Agreement or by the Manager, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Manager to act as an agent of the Company in accordance with the preceding sentence. Any Member who takes any action or binds the Company in violation of this Paragraph 4.03 shall be solely responsible for any loss and expense incurred by the Company as a result of the unauthorized action and shall indemnify and hold the Company harmless with respect to such loss or expense.

**Paragraph 4.04  Liability for Certain Acts.**  The Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member,

8

unless the loss or damage shall have been the result of fraud, deceit, gross negligence, breach of his duties or willful misconduct by the Manager.

**Paragraph 4.05  Manager Has No Exclusive Duty to Company.** The Manager shall not be required to manage the Company as its sole and exclusive function, and it may have other business interests and engage in activities in addition to those relating to the Company, including activities that may be competitive with the Company. Neither the Company nor any Member shall have any right, by virtue of this Operating Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

**Paragraph 4.06  Indemnity of the Manager.**

(a)     Subject to the limitations and conditions provided in this Paragraph 4.06, each Person ("Indemnified Person") who was or is made a party or is threatened to be made a party to or is involved in any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative, arbitrative or investigative ("Proceeding"), or any appeal in such a Proceeding or any inquiry or investigation that could lead to such a Proceeding, by reason of the fact that he, or a Person of whom he is the legal representative, is or was a Manager of the Company or is or was serving as a manager, director, officer, partner, venturer, proprietor, trustee, employee, agent or similar functionary of another entity that is or was a Manager shall be indemnified by the Company against judgments, penalties (including excise and similar taxes and punitive damages), fines, settlements and reasonable costs and expenses (including, without limitation, attorneys' fees) actually incurred by such Indemnified Person in connection with such Proceeding if such Indemnified Person acted in good faith and in a manner he reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the Indemnified Person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal action or proceeding, that the Indemnified Person had reasonable cause to believe that his conduct was unlawful.

(b)     To the extent that an Indemnified Person has been successful, on the merits or otherwise, in the defense of any action, suit or proceeding referred to in Paragraph 4.06 (a), or in defense of any claim, issue or matter therein, he will be indemnified against expenses (including attorneys' fees) actually and reasonably incurred in connection therewith.

(c)     Any indemnification under this Paragraph 4.06 (unless ordered by a court) shall be made by the Company only as authorized in the specific case, upon a determination that indemnification is proper in the circumstances because the Indemnified Person has met the applicable standard of conduct set forth therein. Such determination shall be made by the Members who were not parties to or subjects of such threatened or actual Proceeding. If there are no disinterested Members, then the determination shall be made by the Company's independent legal counsel, whose fees must be paid by the Company.

9

(d)    Indemnification under this Paragraph 4.06 shall continue as to an Indemnified Person who has ceased to serve in the capacity which initially entitled such Indemnified Person to indemnity hereunder. The rights granted pursuant to this Paragraph 4.06 shall be deemed contract rights, and no amendment, modification or repeal of this Paragraph 4.06 shall have the effect of limiting or denying any such rights with respect to actions taken or Proceedings arising prior to any such amendment, modification or repeal.

(e)    The right to indemnification conferred by this Paragraph 4.06 shall include the right to be paid or reimbursed by the Company for the reasonable expenses incurred in advance of the final disposition of the Proceeding and without any determination as to the Indemnified Person's ultimate entitlement to indemnification; provided, however, that the payment of such expenses incurred in advance of the final disposition of a Proceeding shall be made only upon delivery to the Company of a written affirmation by such Indemnified Person of his good faith belief that he has met the standard of conduct necessary for indemnification under this Paragraph 4.06 and a written undertaking, by or on behalf of such Indemnified Person, to repay all amounts so advanced if it shall ultimately be determined that such Indemnified Person is not entitled to be indemnified under this Paragraph 4.06 or otherwise.

**Paragraph 4.07  Compensation and Expenses.** No Member or Manager shall be entitled to compensation, unless stated otherwise in this Agreement, or reimbursement from the Company for direct out-of-pocket expenses incurred on behalf of the Company without the prior approval of the Manager.

**Paragraph 4.08  Execution of Documents.** Any document or instrument of any and every nature, including without limitation, any agreement, contract, deed, promissory note, mortgage or deed of trust, security agreement, financing statement, pledge, assignment, bill of sale and certificate, which is intended to bind the Company or convey or encumber title to its real or personal property shall be valid and binding for all purposes only if executed by the Manager.

**Paragraph 4.09  Resignation.** Any Manager of the Company may resign at any time by giving written notice to the Members of the Company. The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective. The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

**Paragraph 4.10  Development Fee.** The Manager or an Affiliate of the Manager shall be entitled to a reasonable development fee, which shall be no less than two percent (2%) per annum of the projected committed capital (i.e. land, development and construction costs, excluding financing costs) for the Development Entity and twenty percent (20%) of the Net Profits.

10

## ARTICLE V
## GENERAL RIGHTS AND OBLIGATIONS OF MEMBERS

**Paragraph 5.01  Limitation of Liability.** Each Member's liability shall be limited as set forth in this Operating Agreement, the Act and other applicable law.

**Paragraph 5.02  Company Debt Liability.** A Member will not be personally liable for any debts or losses of the Company beyond his or her respective Capital Contributions except as otherwise required by law.

**Paragraph 5.03  List of Members.** Upon the written request of any Member, the Manager shall provide a list showing the names, addresses and Membership Interests of all Members.

**Paragraph 5.04  Company Books.** The Manager will  maintain and preserve, during the term of the Company, the accounts, books, and other relevant Company documents described in Paragraph 8.08 or required to be kept by Section 18-305 of the Act. Upon reasonable written request, each Member shall have the right, at any time during ordinary business hours, as reasonably determined by the Manager, to inspect and copy, at the requesting Member's expense, the Company documents identified in Section 18-305 of the Act, and such other documents which the Manager, in its discretion, deems appropriate.

**Paragraph 5.05  Priority and Return of Capital.** Except as may be expressly provided in Article VII, no Member shall have priority over any other Member, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Paragraph 5.05 shall not apply to loans which a Member has made to the Company.

**Paragraph 5.06  Special Status of [Laquer Entity].**

(a)      [Laquer Entity], and its successors and assigns, shall have no right to vote on or consent to any matter subject to a vote by or consent of the Members, and its Membership Units shall be excluded from the Membership Units considered for determining Majority Interest.

(b)      If [Laquer Entity] breaches any of its obligations under this Agreement or the Act, the Manager may determine in its sole discretion to take all or any of the following actions:

(i)      to notify [Laquer Entity] that it has ceased to be a Member and will have no further power to exercise any rights under this Agreement, except as an Economic Interest Owner;

(ii)      to notify _____ that it may, within thirty (30) days after receipt of notice from the Manager, elect to purchase the Membership Interest of [Laquer Entity] for the sum of the Capital Contributions it has made to the Company; if _____ exercises this right of purchase, [Laquer Entity] and _____ will consummate the Disposition within thirty (30) days after _____'s election, [Laquer Entity] will transfer its Membership Interest by executing and delivering an assignment with full warranties,

11

free and clear of all liens and encumbrances, and _____ will pay the Purchase Price in cash; until the Disposition described in this item (ii) shall have been consummated, [Laquer Entity] will continue to be obligated to the Company as provided in this Agreement; and

(iii)    to apply any distributions otherwise payable to [Laquer Entity] to satisfy any claims the Company may have against [Laquer Entity].

## ARTICLE VI
## MEETINGS OF MEMBERS

**Paragraph 6.01  Meetings of and Voting by Members.**

(a)    A meeting of the Members may be called at any time by the Manager. The meeting of Members shall be held at the Company's principal place of business or at any other place designated by the Manager. Not less than five (5) nor more than thirty (30) days before each meeting, the Manager shall give written notice of the meeting to each Member entitled to vote at the meeting. The notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Operating Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than a Majority Interest shall constitute a quorum. A Member entitled to vote may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

(b)    Except as otherwise provided in this Operating Agreement, the affirmative vote of Members holding a Majority Interest shall be required to approve any matter coming before the Members.

(c)    In lieu of holding a meeting, the Members entitled to vote may vote or otherwise take action by a written instrument indicating the consent of Members holding a Majority Interest.

(d)    In all elections for a Manager, there shall not be cumulative voting.

(e)    The terms of this Article VI may be amended with the consent of a Majority in Interest.

## ARTICLE VII
## CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

**Paragraph 7.01  Members' Initial Capital Contributions.**   Contemporaneously with the execution of this Agreement, each Member will contribute to the Company as its required Initial Capital Contribution the amount set forth on the Schedule of Capital Contributions attached hereto as Exhibit A.  In return for its Initial Capital Contribution, each Member will receive a credit to its

12

Capital Account equal to his Initial Capital Contribution. If any prospective Member should fail to provide an Initial Capital Contribution as and when required, its Company Interest will thereupon be deemed forfeited, and it will have no further rights under this Agreement or with respect to the Company.

**Paragraph 7.02 Capital Accounts.**

(a)    A separate Capital Account will be maintained for each Member. Each Member's Capital Account will be increased by (i) the amount of money contributed by such Member to the Company, including the Special Equity; (ii) the fair market value of the property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); (iii) allocations to such Member of Net Profits; and (iv) allocations to such Member of income described in Code Section 705(a)(1)(B). Each Member's Capital Account will be decreased by (i) the amount of money distributed to such Member by the Company; (ii) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); (iii) allocations to such Member of expenditures described in Code Section 705(a)(2)(B); and (iv) allocations to such Member of Net Losses.

(b)    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member or Economic Interest Owner (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations , Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and the book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(c)    In the event of a permitted sale or exchange of a Membership Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(d)    The manner in which Capital Accounts are to be maintained pursuant to this Paragraph 7.02 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder. If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this

13

Paragraph 7.02 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Paragraph 7.02, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in the Operating Agreement.

### Paragraph 7.03  Withdrawal or Reduction of Members' Contributions to Capital.

(a)     Each Member agrees not to withdraw as a member of the Company prior to the expiration of the term set forth in Paragraph 2.05 without the approval of the other Member(s). A Member who withdraws as a Member of the Company without the consent of the other Member shall be liable to the Company for any damages suffered by the Company on account of the breach and shall not be entitled to receive any payment for his Interest or a return of his Capital Contribution until the time otherwise provided herein for distributions to Members. A Member shall not receive from the Company any part of his or her Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)     A Member, irrespective of the nature of his or her Capital Contribution, has only the right to demand and receive cash in return for his or her Capital Contribution.

### Paragraph 7.04  Additional Capital.

(a)     If the Company should require capital for any reason in addition to any money provided pursuant to Paragraph 7.01 hereof, the Manager may elect either (i) to borrow the needed funds from an independent lender, (ii) to accept from any Member a loan of the required funds, which loan shall be on such terms and conditions as the Manager may determine but may not accrue interest at a rate per annum greater than Prime Rate plus 5% (a "*Member Loan*"), which would be treated as a debt of the Company and not as a Capital Contribution, or (iii) to require each of the Members to provide an additional cash Capital Contribution in an amount equivalent to its Sharing Ratio of the required funds.

(b)     If the Manager requires additional cash Capital Contributions pursuant to the preceding subparagraph, each Member will pay its required additional cash Capital Contribution to the Company within ten (10) days after delivery of notice by the Manager.  If a Member fails to provide an additional cash Capital Contribution as and when required, the other Member (or, if there are more than one other Members, then all of such Members in accordance with the determination of a Majority Interest between or among them pursuant to their Sharing Ratios) may elect within twenty (20) days after the date of such Member's failure to fund any one of the following remedies:

(i)     to provide such additional cash Capital Contribution required of the defaulting Member and to cause the Sharing Ratios to be adjusted to reflect the Capital Contributions provided to the Company by the Members, giving a 2X effect to the additional cash Capital Contribution provided to the Company pursuant to this item (i);

14

(ii)    to provide the required money in the form of a Preferred Capital Contribution;

(iii)   to provide the required money to the Company in the form of a Company Covering Loan; or

(iv)    to provide the required money to the defaulting Member ("Noncontributing Member") as a Member Covering Loan, which Member ("Contributing Member") will advance the loan proceeds to the Company as the required additional cash Capital Contribution.  Member Covering Loan shall be secured by a Lien on the Interest of the Noncontributing Member, which may be enforced by the Contributing Member(s) at law or equity (by foreclosure or otherwise).  Member Covering Loans shall be non-recourse to the Noncontributing Member secured solely by its Interest, and the Noncontributing Member hereby grants a security interest in its Interest to the Contributing Member(s) who have advanced such Member Covering Loan and does hereby irrevocably appoint such Contributing Member(s), and any of their agents, officers or employees, as its attorneys-in-fact with full power and authority to prepare and execute any documents, instruments and agreements, including any note evidencing such Member Covering Loan, and such UCC financing statements, continuation statements, and other security instruments as may be appropriate (although no such documents shall be necessary) to perfect and continue such security interest in favor of such Contributing Member(s).  Any distributions otherwise payable to the Noncontributing Member under this Agreement shall be applied first to the repayment of the Member Covering Loans (pro rata based on the amount of such Member Covering Loans to each Contributing Member) and the Noncontributing Member shall receive no distributions until such debt is paid in full.  The Company is hereby authorized and directed to pay the amount of any such distributions (to the extent of the amount owing by the Noncontributing Member to the Contributing Members, as aforesaid, including interest) to the Contributing Members in repayment of the Member Covering Loans.  Any amounts so paid shall be deemed to have been distributed to the Noncontributing Member and then paid to the Contributing Member(s) in repayment of such Member Covering Loans.  This Agreement is intended to constitute a security agreement within the meaning of the Uniform Commercial Code.  Each Contributing Member shall send written notice of its exercise of the option under this Subparagraph 7.04(b)(iv) to the Company and the Noncontributing Member.

**Paragraph 7.05  Creditors.**  The provisions of this Article VII are not intended to be for the benefit of any creditor or other person (other than a Member in its capacity as Member) to whom any debts, liabilities or obligations are owed by (who otherwise has any claim against) the Company or any of the Members, and no such creditor or other person shall obtain any right under any such provisions or shall by reason of any such provisions make any claim in respect of any debt, liability, obligation or claim against the Company or any of the Members.

**Paragraph 7.06  Generally.**  No Member shall be entitled to withdraw any part of its Capital Contributions or Capital Account or to receive any distribution from the Company except as specifically provided in this Agreement.  Except as provided in this Agreement, no Member shall be required under any circumstances to contribute or lend any money or property to the

15

Company. Except as otherwise provided in this Agreement or the Act, no Member shall have any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

### ARTICLE VIII
### ALLOCATIONS, INCOME TAX,
### DISTRIBUTIONS, ELECTIONS AND REPORTS

**Paragraph 8.01  Allocations of Net Profits and Net Losses.**

(a)    After giving effect to the special allocations set forth in Paragraph 8.02 hereof, Net Profits for any Fiscal Year will be allocated to the Members in accordance with the following order:

(i)    first, to the Members in the reverse order of the allocation of Net Losses and in the same ratio as originally made within each level of priority under Paragraph 8.01(b) until the cumulative Net Profits allocated to them pursuant to this Paragraph 8.01(a) for the current and all prior Fiscal Years are equal to the cumulative Net Losses allocated to them pursuant to Paragraph 8.01(b) hereof for all prior Fiscal Years; and

(ii)    the balance, if any, to the Members in accordance with their Sharing Ratios.

(b)    After giving effect to the special allocations set forth in Paragraph 8.02 hereof, Net Losses for any Fiscal Year will be allocated in accordance with the following order, subject to the limitation in Paragraph 8.01(c) below:

(i)    first, to the Members in proportion to the amount of and until the cumulative Net Losses allocated to them pursuant to this Subparagraph (i) for the current and all prior Fiscal Years are equal to the cumulative Net Profits, if any, allocated pursuant to Paragraph 8.01(a) for all prior Fiscal Years;

(ii)    second, among the Members in portion to and to the extent of the positive balance in their Capital Accounts; and

(iii)    the balance, if any, to the Members in accordance with their Sharing Ratios.

(c)    The Net Losses allocated to the Members pursuant to Paragraph 8.01(b) will not exceed the maximum amount of Net Losses that can be so allocated without causing any of the Members to have an Adjusted Capital Account Deficit at the end of any such Fiscal Year. The limitations set forth in this Paragraph 8.01(c) will be applied so as to allocate the maximum permissible Losses to the Members under Treasury Regulations §1.704-1(b)(2)(ii)(d).

**Paragraph 8.02  Special Allocations.** The following special allocations will be made in the following order:

16

(a)     (<u>Minimum Gain Chargeback</u>) Notwithstanding any other provision of this Article VIII, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain determined in accordance with Treasury Regulations §1.704-2(g)(2). Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated will be determined in accordance with Treasury Regulations §§1.704-2(f)(6) and 1.704-2(j)(2). This Subparagraph (a) is intended to comply with the minimum gain chargeback requirement in §1.704-2(f) of the Treasury Regulations and will be interpreted consistently therewith.

(b)     (<u>Member Nonrecourse Debt Minimum Gain Chargeback</u>) Except as otherwise provided in Treasury Regulation §1.704-2(i)(4), notwithstanding any other provision of this Article VIII, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations §1.704-2(i)(5), will be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain determined in accordance with Treasury Regulations §1.704-2(i)(4). Allocations pursuant to the previous sentence will be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated will be determined in accordance with Treasury Regulations §§1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Subparagraph (b) is intended to comply with the minimum gain chargeback requirement in §1.704-2(i)(4) of the Treasury Regulations and will be interpreted consistently therewith.

(c)     (<u>Qualified Income Offset</u>) In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations §1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain will be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Subparagraph (c) will be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Article VIII have been tentatively made as if this Subparagraph (c) were not in the Agreement.

(d)     (<u>Gross Income Allocation</u>) In the event that any Member has a deficit Capital Account at the end of any Fiscal Year which is in excess of the sum of (i) the amount such Member is obligated to restore pursuant to any provision of this Agreement, and (ii) the amount such Member is deemed to be obligated to restore pursuant to Treasury Regulations §1.704-2(g)(1) and 1.704-2(i)(5), such Member will be specially allocated items of Company income and gain in the amount of such excess as quickly as possible, provided that an allocation pursuant to this Subparagraph (d) will be made only if and to the extent that such Member would have a deficit Capital Account in excess of such sum after all other allocations provided for in this Article VIII have been tentatively made as if Subparagraph (b) hereof and this Subparagraph (d) were not in the Agreement.

17

(e)    (Section 754 Adjustments)  To the extent an adjustment to the adjusted tax basis of any Company asset pursuant to Code §734(b) or Code §743(b) is required, pursuant to Treasury Regulations §§1.704-1(b)(2)(iv)(m)(2) or 1.704-1(b)(2)(iv)(m)(4), to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of such Member's interest in the Company, the amount of such adjustment to the Capital Accounts will be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis) and such gain or loss will be specially allocated to the Members in accordance with their interests in the Company in the event Treasury Regulations §1.704-1(b)(2)(iv)(m)(2) applies or to the Member to whom such distribution was made in the event Treasury Regulations §1.704-1(b)(2)(iv)(m)(4) applies.

(f)    (Nonrecourse Deductions)  Nonrecourse Deductions for any Fiscal Year or other period will be specially allocated to the Members in accordance with the Sharing Ratios.

(g)    (Member Nonrecourse Deductions)  Member Nonrecourse Deductions for any Fiscal Year or other period will be allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations §1.704-2(i)(1).

(h)    (Curative Allocations)  The allocations set forth in Paragraph 8.01(a), Paragraph 8.01(b), Subparagraphs (a), (b), (c), (d), (e), (f) and (g) hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Regulations.  It is the intent of the Members that, to the extent possible, all Regulatory Allocations will be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Subparagraph (h).  Therefore, notwithstanding any other provision of this Article VIII (other than the Regulatory Allocations), the Manager will make such offsetting special allocations of Company income, gain, loss or deduction in whatever manner it determines appropriate so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Paragraphs 8.02(a) and (b)(i).  In exercising its discretion under this Subparagraph (h), the Manager will take into account future Regulatory Allocations under Paragraphs 8.02(a) and (b) that, although not yet made, are likely to offset other Regulatory Allocations previously made under Paragraphs 8.02(f) and (g).

**Paragraph 8.03  Allocation of Net Profits and Net Losses Upon Transfer or Change in Membership Interests.** It is agreed that if all or a portion of a Member's Membership Interest is transferred or adjusted as permitted herein, Net Profits and Net Losses for the Fiscal Year of the transfer shall be allocated between the transferor and the transferee based upon the number of days in said Fiscal Year each owned such Membership Interest, without regard to the dates upon which income was received or expenses were incurred during said Fiscal Year, except as otherwise required by the provisions of Code Section 706 and Treasury Regulations promulgated thereunder.

18

**Paragraph 8.04  Contributed Property.** Notwithstanding anything contained herein to the contrary, if a Member contributes property to the Company having a fair market value that differs from its adjusted basis at the time of contribution, then items of income, gain, loss and deduction with respect to the property shall be shared among the Members so as to take account of the variation between the adjusted tax basis of the property to the Company and its fair market value at the time of contribution, in the manner prescribed in Code Section 704(c) and the Treasury Regulations promulgated thereunder.

**Paragraph 8.05  Distributions of Cash Flow.**  Distributions of Cash Flow may be made by the Manager (a) in its sole and absolute discretion or (b) if determined by the Manager to be a liquidating distribution as set forth in Subparagraoh 10.02(b)to the Members in such order as it may determine appropriate.

**Paragraph 8.06  Limitation upon Distributions.**

(a)    No distribution or return of capital contributions may be made and paid if, after the distribution or return of a capital contribution, either:

(1)    the Company would be insolvent; or

(2)    the net assets of the Company would be less than zero.

(b)    The Manager may base a determination that a distribution or return of a Capital Contribution may be made under Paragraph 8.06(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

**Paragraph 8.07  Loans to Company.** Nothing in this Operating Agreement prevents any Member from making secured or unsecured loans to the Company by agreement with the Manager.

**Paragraph 8.08  Records, Audits and Reports.** At the expense of the Company, the Manager shall maintain records and accounts of the operations and expenditures of the Company. At a minimum, the Company will keep at its principal place of business the following records:

(a)    A current list of the full name and last known address of each Member setting forth the amount of cash each Member has contributed, a description and statement of the agreed value of the other property or services each Member has contributed or has agreed to contribute in the future, and the date on which each became a Member;

(b)    A copy of the Certificate of Formation of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

19

(c)      Copies of the Company's federal, state and local income tax returns and reports, if any, for the three (3) most recent years and of any financial statements of the Company for the three (3) most recent years; and

(d)      Copies of the Company's currently effective written Operating Agreement and all amendments thereto.

**Paragraph 8.09  Returns.** The Manager must cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, will be furnished to the Members within a reasonable time after the end of the Company's Fiscal Year.

**Paragraph 8.10  Tax Elections.** The Company will make the following tax elections:

(a)      To be treated as a partnership for federal income tax purposes;

(b)      To adopt the calendar year as the Company's tax and Fiscal Year;

(c)      To adopt the accrual method of accounting and to keep the Company's books and records on the income-tax method;

(d)      If a distribution of Company property as described in Section 734 of the Code should occur or if a transfer of a Company Interest as described in Section 743 of the Code should occur, on request by Notice from any Member, to elect, pursuant to Section 754 of the Code, if such election has not been previously made, to adjust the basis of Company property; provided that the Manager may require the Member(s) (or his or their successor) requesting such election to reimburse the Company for any additional expense incurred as a result of such election;

(e)      To elect to amortize the organizational expenses of the Company ratably over a period of 60 months as permitted by Section 709(b) of the Code; and

(f)      Any other election that the Manager may deem appropriate and in the best interests of the Company.

**Paragraph 8.11  Tax Matters Partner.** The Manager is designated the "Tax Matters Partner" (as defined in Code Section 6231) and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith. The Members agree to cooperate with each other and to do, or refrain from doing, any and all things reasonably required to conduct such proceedings. The Tax Matters Partner will ensure that each Member, if he or she has so requested, is made a notice partner within the meaning of Section 6223 of the Code.

20

**ARTICLE IX**
**DISPOSITIONS OF INTERESTS**

**Paragraph 9.01  Prohibition.**

(a)     Except as otherwise permitted or required by this Agreement, no Member may make or consent to a Disposition of his Membership Interest, and an assignee of a Membership Interest will not become a Member unless approved by a Majority Interest.  Each Member acknowledges the reasonableness of the restrictions on the Disposition of his Membership Interest imposed by this Agreement in view of the Company purposes and the relationship among the Members.  Each Member hereby further agrees to hold the Company and each Member (and each Member's successors and assigns) wholly and completely harmless from any costs, liability or damage (including, without limitation, liabilities for income taxes and costs of enforcing this indemnity) incurred by any of such indemnified Persons as a result of a Disposition or an attempted Disposition of Membership Interest in violation of this Agreement and efforts to enforce the indemnity granted hereby.  Accordingly, the restrictions on Disposition of Membership Interests contained herein will be specifically enforceable.

(b)     If at any time Edie Laquer is not the sole Manager with the sole authority to act on behalf of [Laquer Entity], a prohibited Disposition shall be deemed to have occurred, which shall constitute a default hereunder by [Laquer Entity], and in any event [Laquer Entity] shall thenceforth be treated as a transferee which has not been admitted as a substituted Member.

**Paragraph 9.02  Permitted Transfers.**

(a)     Each Member may sell, give or bequeath all or any part of his Membership Interest to any other Member without restriction of any kind. Furthermore, each Member may sell, give or bequeath all or any part of his Economic Interest to such Member's spouse, children or heirs, or trusts for his own or their benefit, or to any entity owned or controlled by such persons or entities. The rights accorded each Member under this Paragraph 9.02 may also be exercised by any successor, executor, administrator, spouse, child or heir who may have succeeded to a Member's interest.

(b)     [Laquer Entity] may transfer up to fifty percent (50%) of its Membership Interest to Scott Silver; provided however, [Laquer Entity] has received prior written consent from _____ regarding the transfer.  Furthermore, Scott Silver shall have no right to participate in the management of the business and affairs of the Company or to vote on any Company matters.

**Paragraph 9.03  Right of First Refusal.**

(a)     Except with respect to transfers described in Paragraph 9.02, if [Laquer Entity] desires to sell all or any portion of its Membership Interest or Economic Interest ("Offered Interest"), it shall obtain from the purchaser a bona fide written offer ("Offer") to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the

21

consideration offered therefor which must be payable in money. [Laquer Entity] shall give written notification to the remaining Members, by certified mail or personal delivery, of its intention to transfer the Offered Interest, furnishing to the remaining Members a copy of the Offer and, if such purchaser is not a public company, reasonable biographic and financial information for the purchaser.

(b)    The remaining Members, and each of them, on a basis pro rata to their Sharing Ratios or on a basis pro rata to the Sharing Ratios of those remaining Members exercising their right of first refusal, have the right to exercise a right of first refusal to purchase all (but not less than all) of the Offered Interest upon the same terms and conditions as stated in the Offer by giving written notification to [Laquer Entity], by certified mail or personal delivery, of their intention to do so within forty-five (45) days after receiving written notice from [Laquer Entity] (the "Option Period"). The failure of at least one of the remaining Members to so notify [Laquer Entity] of its desire to exercise this right of first refusal within said forty-five (45) day period will terminate the right of first refusal as to such Offer and [Laquer Entity] may thereafter consummate the sale of the Offered Interest, but only to the purchaser identified in the Offer and on the terms contained in the Offer, and provided that the sale must be consummated within sixty (60) days following the expiration of the Option Period.

(c)    If any one or more of the remaining Members give written notice to [Laquer Entity] of their desire to exercise their right of first refusal and to purchase the Offered Interest upon the same terms and conditions as are stated in the Offer, the remaining Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after the expiration of the Option Period.

**Paragraph 9.04  Tag Along Rights.**  If _____ has determined to transfer all of its Membership Interest to a third party, it shall notify (the "***Tag Along Notice***") [Laquer Entity] of such transfer and the name and contact information for the prospective purchaser.  If [Laquer Entity] wishes to do so, it may elect also to transfer its Membership Interest to such purchaser by delivering an offer notice to _____ and such purchaser within fifteen (15) days after [Laquer Entity] has received the Tag Along Notice.  In this event, the purchaser will be obligated to purchase [Laquer Entity]'s Membership Interest at a price based on the price to be received by _____ and on the same terms and conditions applicable to _____.

**Paragraph 9.05  Sale of the Company.**

(a)    If a Majority Interest wishes to accept an offer to purchase all of the Interests (an "***Approved Sale***"), (i) each Member shall vote for, consent to and raise no objections against, and waive any dissenters or appraisal rights with respect to, such Approved Sale, and each Member shall consummate such Approved Sale on the terms and conditions so approved, and (ii) each Member shall take all necessary or desirable actions in connection with the consummation of the Approved Sale.

(b)    Each Member shall be severally obligated to join and become a party to any agreement approved by a Majority Interest with respect to an Approved Sale (on a pro rata basis)

22

providing for representations and warranties, indemnification obligations (including escrows, holdback or other similar arrangements to support such indemnity obligations), releases or other obligations to which a Majority Interest agrees in connection with such Approved Sale (other than any such obligations that relate specifically to a Member, such as indemnification with respect to representations and warranties given by a Member regarding such Member's title to and ownership of Membership Interests as to which obligations each such Member shall be solely liable). Each Member (A) hereby appoints the Manager or its designee as its representative in connection with any sale agreement with customary provisions (including the right to resolve any potential indemnification claims or other disputes on behalf of all Members) and (B) hereby irrevocably grants to, and appoints, the Manager or its designee, such Member's proxy and attorney-in-fact (with full power of substitution) for and in the name, place and stead of such Member, to vote the Membership Interests held by such Member, or to grant a consent or approval with respect to such Membership Interest, in connection with any meeting of the Members or any action by written consent in lieu of a meeting of the Members with respect to an Approved Sale. Each Member hereby affirms that the irrevocable proxy set forth in this Paragraph 9.04(b) is given to secure the performance of the duties of such Member under this Agreement. Each Member hereby further affirms that the irrevocable proxy set forth in this Paragraph 9.04 is coupled with an interest and irrevocable.

(c)    In the event of a sale or exchange by the Members of all or substantially all of the Membership Interests held by the Members (whether by sale, merger, recapitalization, reorganization, consolidation, combination or otherwise), each Member shall receive in exchange for the Membership Interest held by such Member the same portion of the aggregate consideration from such sale or exchange that such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth herein as in effect immediately prior to such or exchange. Each Member shall take all necessary or desirable actions in connection with the distribution of the aggregate consideration from such sale or exchange as requested by the Company.

**Paragraph 9.06  Effect of Transfer.**

(a)    As a condition to the Company recognizing the effectiveness of any transfer permitted hereunder, the Manager shall require the transferring Member or the transferee, as the case may be, to execute, acknowledge and deliver such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the Manager may deem necessary or desirable to:

(1)    verify the transfer;

(2)    confirm that the person desiring to acquire an Interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and bound by all of the terms, obligations and conditions of this Operating Agreement (whether or not such Person is to be admitted as a new Member);

(3)    maintain the status of the Company as a partnership; and

23

(4)    assure compliance with any applicable state and federal laws, including but not limited to securities laws and regulations.

(b)    Any transfer of a Membership Interest or admission of a Member in compliance with this Article IX shall be deemed effective as of the last day of the calendar month in which the Members' consent thereto was given. The transferring Member agrees, upon request of the Manager, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the Manager from time to time in connection with such transfer. The transferring Member hereby agrees to indemnify the Manager, and the remaining Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article IX.

**Paragraph 9.07  Transferee Not Member in Absence of Consent.** Notwithstanding anything contained herein to the contrary (including, without limitation, Paragraph 9.02 and Paragraph 9.03 hereof), a transferee of a Membership Interest shall have no right to participate in the management of the business and affairs of the Company or to become a Member unless the transfer and the transferee's admission is approved by the Manager.

**Paragraph 9.08  Resignation of a Member.** Upon the resignation of a Member, that Member is not entitled to be paid for his Membership Interest and is not entitled to receive any distributions in excess of those distributions to which such Member would have been entitled had such event not occurred.

**Paragraph 9.09  Interests in Member.** A Member that is not a natural person may not cause or permit an ownership interest, direct or indirect, in itself to be disposed of such that, after the disposition: (a) the Company would be considered to have terminated within the meaning of Section 708 of the Code; or (b) that Member ceases to be controlled by the same Persons who control it as of the date of the Member's admission to the Company. For a period of 120 days after notice to the Company of any Member's breach of the provisions of this Paragraph 9.08, the Company will have the option to buy, and on exercise of that option the breaching Member must sell, the breaching Member's Membership Interest, at a price equal to the Capital Account balance of the breaching Member. The breaching Member must deliver documents satisfactory to the Company conveying its Membership Interest free and clear of all liens, claims and encumbrances.

## ARTICLE X
### DISSOLUTION AND TERMINATION

**Paragraph 10.01  Dissolution.**

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(1)    the expiration of the term fixed pursuant to Paragraph 2.05 hereof; or

24

      (2)      by the written consent of a Majority Interest.

The Company shall not be dissolved upon the death, incompetency, retirement, resignation, expulsion, dissolution or bankruptcy of a Member.

      (b)      If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

### Paragraph 10.02  Winding Up, Liquidation and Distribution of Assets.

      (a)      Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Manager shall promptly proceed to wind up the affairs of the Company.

      (b)      If the Company is dissolved and its affairs are to be wound up, the Manager is directed to:

      (1)      sell or otherwise liquidate such of the Company's assets as may be required to discharge all liabilities of the Company, and establish such Reserves as may be reasonably necessary to provide for contingent liabilities of the Company (for purposes of determining the Capital Accounts of the Members, the amounts of such Reserves shall be deemed to be an expense of the Company);

      (2)      allocate any profit or loss resulting from such sales to the Capital Accounts in accordance with Article VIII hereof; and

      (3)      distribute the remaining assets in accordance with the following priorities:

      (i)      First, to the Members in payment of Member Loans, in reverse chronological order with accrued interest and then unpaid principal of the most recent Member Loan being paid first;

      (ii)      Second, to the Members in payment of Company Covering Loans, in reverse chronological order with accrued interest and then unpaid principal of the most recent Company Covering Loan being paid first;

      (iii)      Third, to the Members in payment of Preferred Capital Return, pro rata in accordance with the total sums due the Members so that the full amount of the Preferred Capital Return due them is discharged simultaneously;

      (iv)      Fourth, to the Members in payment of Preferred Capital, pro rata in accordance with the total sums due the Members so that the full amount of the Preferred Capital due them is discharged simultaneously; and

25

           (v)     Fifth, to the positive balance (if any) of each Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs), and

           (vi)     The balance, to the Members in accordance with their Sharing Ratios.

Such distributions shall be made either in cash or in kind, as determined by the Manager, with any assets distributed in kind being valued for this purpose at their fair market value as determined by the Manager. Any such distributions in respect of Capital Accounts must be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations. The Company may offset damages for breach of this Operating Agreement by a Member whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

       (c)     Notwithstanding anything to the contrary in this Operating Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Treasury Regulations, if any Member has a deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

       (d)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

       (e)     The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

       (f)     Provisions herein to the contrary notwithstanding, if a Member is entitled to a distribution from the Company at a time when it is obligated to another Member on a Member Covering Loan, the Company will apply the proceeds otherwise payable to such Member first in payment of accrued interest and then unpaid principal due on the Member Covering Loan.

      **Paragraph 10.03 Certificate of Cancellation.** When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, a certificate of cancellation, as required by the Act, shall be executed and filed with the Delaware Secretary of State.

      **Paragraph 10.04  Effect of Filing of Certificate of Cancellation.** Upon the filing of a certificate of cancellation with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act. The Manager shall have authority to distribute any Company property discovered

after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

**Paragraph 10.05  Return of Contribution Nonrecourse to Other Members.** Except as provided by law or as expressly provided in this Operating Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution. If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member.

**ARTICLE XI**
**MISCELLANEOUS PROVISIONS**

**Paragraph 11.01  Notices.** Any notice, demand, or communication required or permitted to be given by any provision of this Operating Agreement to be effective must be in writing and delivered personally to the party, or to an officer or partner of a party that is an Entity, by certified mail, return receipt requested, postage and charges prepaid, by telephone facsimile or by overnight courier service, such as Federal Express, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this Operating Agreement. Except as otherwise provided herein, any such notice shall be deemed to be given on the date of hand-delivery, two (2) business days after the date on which the same was deposited in the United States mail, addressed and sent as aforesaid, on the day of telephone facsimile and confirmed receipt (provided, however, if receipt has been confirmed after 5 p.m. on any day, delivery will be deemed on the following business day) and on the date of the addressee's receipt if by overnight courier service.

**Paragraph 11.02  Application of Delaware Law.** This Operating Agreement, and its interpretation, shall be governed exclusively by its terms and by the laws of the State of Delaware and specifically the Act.

**Paragraph 11.03  Waiver of Action for Partition.** Each Member and Economic Interest Owner irrevocably waives during the term of the Company any right that it may have to maintain any action for the partition with respect to the property of the Company.

**Paragraph 11.04  Amendments.** Except as otherwise provided herein, this Operating Agreement may not be amended except in writing signed by all of the Members.

**Paragraph 11.05  Execution of Additional Instruments.** Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

**Paragraph 11.06  Construction.** Whenever the singular number is used in this Operating Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

27

**Paragraph 11.07  Headings.** The headings in this Operating Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Operating Agreement or any provision hereof.

**Paragraph 11.08  Waivers.** No party's undertakings or agreements contained in this Operating Agreement shall be deemed to have been waived unless such waiver is made by an instrument in writing signed by an authorized representative of the other Member. Failure of a party to insist on strict compliance with the provisions of this Operating Agreement shall not constitute waiver of that party's right to demand later compliance with the same or other provisions of this Operating Agreement. A waiver of a breach of this Operating Agreement will not constitute a waiver of the provision itself or of any subsequent breach, or of any other provision of this Operating Agreement.

**Paragraph 11.09  Rights and Remedies Cumulative.** The rights and remedies provided by this Operating Agreement are cumulative, and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

**Paragraph 11.10  Severability.** If any provision of this Operating Agreement or the application thereof to any Person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Operating Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

**Paragraph 11.11  Heirs, Successors and Assigns.** Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Operating Agreement, their respective heirs, legal representatives, successors and assigns.

**Paragraph 11.12  Creditors.** None of the provisions of this Operating Agreement shall be for the benefit of or enforceable by any creditors of the Company, the Members or the Economic Interest Owners.

**Paragraph 11.13  Counterparts.** This Operating Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which shall constitute one and the same instrument.

**Paragraph 11.14  Confidentiality.** Without the prior written consent of the Manager, [Laquer Entity] shall keep confidential and not disclose to any person any aspect of the Company's business or the identity of any Member or any Member's Affiliates. [Laquer Entity] may, however, disclose such confidential information to its representatives, such as its attorney, so long as it requires each such representative to maintain the absolute confidentiality of all such information.

**Paragraph 11.15  Legal Representation.** The Company may retain one or more legal counsel (the *"Law Firm"*)_from time to time to represent the Company on specific matters, and

the Members hereby recognize and acknowledge that such representation of the Company shall not establish any attorney-client relationship between the Members and the Law Firm. It is further acknowledged and agreed by the Members that any Law Firm representing the Company may also represent the Manager, any Member and any Affiliate of the Manager or any Member.

[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the Members have executed this Operating Agreement on the date first written above.

[LAQUER ENTITY]

By:_____

    Edie Laquer, _____

_____, LLC

By:   _____, LLC,

    its Manager

       By:_____.

         _____, as its

         _____

## SCHEDULE OF MEMBERS, CAPITAL CONTRIBUTIONS AND
## <u>MEMBERSHIP UNITS</u>

| <u>Member's Name and Contact Information</u> | <u>Initial Capital Contribution</u> | <u>Membership Units</u> |
|---|---|---|
| [Laquer Entity]<br>c/o Edie Laquer<br>Wachovia Financial Center<br>200 South Biscayne Boulevard<br>Suite 2930<br>(temporary Suite #2770)<br>Miami, Florida 33131 | $_____ | 50 |
| _____, LLC<br>823 University Boulevard<br>Suite 204<br>Jupiter, Florida 33458 | $_____ | 950 |

<u>Exhibit A</u>

## LAQUER BROKER RIGHTS

## Schedule D